## BELANGER v. ALTON BOX BOARD CO.
### No. 9954.

United States Court of Appeals
Seventh Circuit.

Feb. 20, 1950.

---

88

John D. Picco, Chicago, Ill., Samuel W. Kipnis, Chicago, Ill., William H. De Busk, Chicago, Ill., Louis Linton Dent, Chicago, Ill., for appellant.

Henry I. Green, Urbana, Ill., John N. Thornburn, Chicago, Ill., for appellee.

Before KERNER, FINNEGAN and SWAIM, Circuit Judges.

FINNEGAN, Circuit Judge.

This case was tried without the intervention of a jury. The District Court ordered that the complaint of the plaintiff, Albert P. Belanger, be dismissed and that he recover nothing from the defendant, Alton Box Board Company. On defendant's counterclaim, the court ordered that the plaintiff execute and deliver to the defendant assignments of certain letters patent, of certain applications for letters patent, and also assignments of all and any other patent applications which relate to paperboard or products thereof, made by the plaintiff during the term of his employment by defendant.

Plaintiff's complaint consisted of two counts. The first denominated an action "in law," was based upon an alleged oral contract between the plaintiff and the defendant acting through George G. Otto, its vice-president and general manager. The second, called an action "in equity" was based upon an alleged fiduciary relationship between the parties. The object of both counts was to recover royalties or commissions arising from the sale by the defendant of certain devices manufactured under patents issued to or applied for by the plaintiff. Three such inventions were specifically named in each count: First,—the Bomb Ring and Clamping Band therefor; second,—the Fin Lock Nut Protector; and third,—the Ammunition Retaining Cup. These royalties are claimed to be in addition to a yearly salary of $5,000 which was paid plaintiff while he was employed by defendant. Federal jurisdiction arose from diversity of citizenship. More than $1,000,000 was claimed to be involved.

In its answer the defendant denied it ever made, or that there ever existed any contract between plaintiff and itself to pay to him any commissions or royalties, or that he had ever confidentially revealed to defendant any of his inventions. It admitted that plaintiff entered its employ on or about December 15, 1942, and remained employed until January, 1948, and that he was paid at the rate of $5,000 per year. It alleged that he was employed to work in its research department to find new and improved uses for paperboard as manufactured by the defendant so that the market for the sale of such paperboard might be improved and increased.

Defendant also filed a counter-claim praying that plaintiff be required to assign to defendant all rights in any applications for patents in the paperboard field made while he was employed by defendant, and also all patents in that field procured by him during said period.

To support his contention that the judgment and order of the District Court should be reversed, the plaintiff-appellant urges these propositions:

First: that the trial court erred in its findings as to the terms of the contract between the parties;

Second: that the court erred in directing the assignment of plaintiff's patents and applications for patents to the defendant.

Third: that the refusal of the trial court to direct that plaintiff be allowed to inspect the files of defendant's attorney constituted reversible error;

Fourth: that the court erred in refusing to admit the depositions of the witnesses Swaim and Hoagland.

Since plaintiff's claim for royalties or commissions is made on three distinct inventions, it will serve to clarify the merits of his contentions if we consider each of them separately.

We consider first the so-called Bomb Ring and Clamping Band therefor. In connection with this device, the District Court found the following facts:

"Prior to 1942, Plaintiff had made a number of inventions and obtained some patents relating inter alia to paper products. In May 1942, he became a civilian employee of the Chicago District Ordnance Office of the War Department of the United States and was assigned to duty in the Conversion Section thereof having to do with devising and improving articles of war material and their manufacture. In the course of such employment, plaintiff claims to have devised a certain paper Bomb Ring, as shown and described in

United States Patent No. 2,402,145, granted June 18, 1946."

"Prior to 1942, plaintiff had been financed on some of his inventive ventures by one Jacob Teller. Teller was a stove broker, who had wide experience with invention and patent matters relating to stoves. Teller claimed to be a partner with plaintiff in any inventions which plaintiff might make. Teller's claim of partnership extended to inventions which plaintiff might make while in the employ of the Ordnance Office, and plaintiff freely informed Teller of the ideas and developments (including the paper Bomb Ring), which came to plaintiff while in the employ of the Ordnance Office."

"Prior to 1942, defendant was, and still is, a manufacturer of paper and paperboard, having a mill at Alton, Illinois. During 1942, defendant besought the Chicago District Ordnance Office to find articles of war material which might be made of paper and might be made by defendant. Plaintiff was delegated by his superior, B. W. Collins, to find articles which defendant might make of paper and, in this connection, plaintiff inspected the facilities of defendant at Alton, Illinois, on June 30, 1942. Thereafter, on July 15, 1942, in furtherance of the pursuit, plaintiff and some of defendant's employees went to Madison, Wisconsin, and there consulted with the Forest Products Laboratory. The paper Bomb Ring was not discussed on this trip."

"On or about August 1, 1942, plaintiff telephoned Marvin W. Swaim, defendant's sales manager, at Alton, Illinois, requested said Swaim to wind some paper into rings of stated dimensions, and send the same to plaintiff at Chicago; and, in the same conversation, plaintiff voluntarily explained to Swaim that it was his purpose to adapt the paper rings for use in the place and stead of steel rings theretofore used to protect the suspension lugs on bombs while in transit. Swaim had the paper rings made immediately, forwarded some of the same to plaintiff, and retained others."

"By September 30, 1942, defendant had made up samples of paper Bomb Rings conforming to the structure shown in the drawings of United States Patent No. 2,402,145. These samples were subjected to test at the Aberdeen Proving Grounds, Aberdeen, Maryland, on or about October 1, 1942. As a result of this test, the paper Bomb Rings, as then constructed, were rejected by the Ordnance Department of the United States Army."

"On October 28, 1942, said Otto, said Swaim, and Carlos Byassee, another employee of the defendant, were in the office of Colonel S. R. Stribling, Ordnance Department, United States Army, Washington, D. C., in connection with the paper Bomb Ring. On this occasion, said Stribling urged the provision of a device which could be taken off and put on the bombs in the field without requiring the use of tools. Colonel Stribling suggested a toggle type fastener for the paper band. Later the same day, said Swaim conceived and disclosed to Byassee the idea of a clamping shoe. Swaim and Byassee returned to Alton on October 31, 1942. Early in the morning of Monday, November 2, 1942, Swaim caused two such clamping shoes to be made in defendant's shop at Alton. Such shoes were assembled each with a steel strap and paper ring; the two assemblies applied to a bomb; and tested at Alton on November 2, 1942. On the night of November 2, 1942, twelve such shoes were made in defendant's shop. On November 3, 1942, the twelve shoes were assembled with steel straps and paper rings, and on November 4, 1942, Swaim and Byassee left for Washington with the twelve 'bomb bands.' On November 5, 1942, the devices were exhibited to Colonel Stribling in Washington, and on November 6, 1942, tested at Aberdeen Proving Grounds. On November 7, 1942, Colonel Stribling gave Swaim and Byassee a verbal order for two thousand of the 'bomb bands' like those tested on November 6, 1942."

"Plaintiff had no knowledge of the clamping shoe idea until after November 8, 1942."

"On November 9, 1942, defendant ordered a quantity of clamping shoes from Brower Manufacturing Company, of Quincy, Illinois. These were delivered: 200

on November 19th; 1,000 on November 26th; and the balance on November 27th, 1942. As the clamping shoes were received, defendant assembled them with steel straps and paper rings, 1,000 of such 'bombs bands' were completed by November 27th, 1942, and immediately shipped to Pressed Steel Tank Company, Milwaukee, Wisconsin. On November 28th, 1942, Swaim and Byassee were in Milwaukee and witnessed the application of the 'bomb bands' to a carload of bombs. On November 30th, 1942, Byassee reported the completion of the trial order of 'bomb bands' to a meeting of the Midwest Paperboard Products Development Bureau (the research department of defendant.)"

"Between November 27th, 1942, and August 14th, 1945, defendant made and sold to the United States Government, directly and as sub-contractor, large quantities of such 'bomb bands.' "

"On December 18th, 1942, concurrently with the execution of an application which subsequently matured into United States Patent No. 2,402,145, plaintiff signed a written instrument granting unto the Government of the United States 'the right and license (non-exclusive) to make, use and dispose of according to law and to cause to be made, used and disposed of according to law, for the Government of the United States of America, the subject matter of said invention as shown or described in said application.' At least as early as October 12, 1942, plaintiff knew that he would be required to grant the Government such a license in connection with the 'bomb bands' and 'clamping band.' "

It also appears from the typewritten transcript of testimony that plaintiff in 1945, while discussing Teller's claim for commission, said: "I don't see how he thinks he can get anything on the Bomb Ring. I don't get anything."

It is also material to note in connection with the Bomb Ring that Section 45, Title 35 U.S.C.A., provides as follows: "The Commissioner of Patents is authorized to grant, subject to existing law to any officer, enlisted man, or employee of the Government, except officers and employees of the Patent Office, a patent for any invention of the classes mentioned in section 31 of this title, without the payment of any fee when the head of the department or independent bureau certifies such invention is used or liable to be used in the public interest: *Provided*, That the applicant in his application shall state that the invention described therein, *if patented,* may be manufactured and used by or for the Government for governmental purposes without the payment to him of any royalty thereon, which stipulation shall be included in the patent."

Army Regulation No. 850-50, in force at the time of plaintiff's employment in the Ordnance Division makes similar provision.

On December 18, 1942, plaintiff executed an application for patent on the Bomb Ring, which was filed through army channels in January, 1943, and which stated:

"The invention herein described may be manufactured and used by or for the government for governmental purposes without payment to me of any royalty thereon."

Plaintiff also executed a license, in connection with his application, which provided in part:

"I hereby grant to the Government the right and license (non-exclusive) to make, use and dispose of * * * the subject matter of said invention * * * under any and all letters patent which may be issued for said invention said right to extend throughout the United States and its territories * * * and to remain in full force and effect for the full term for which letters patent may be granted."

The "Bomb Ring" patent was conceived and invented before plaintiff entered the employ of the defendant, but it is also incontestable that all the devices covered thereby manufactured and sold by the defendant were manufactured and sold to or on behalf of the Government of the United States.

Moreover, it should be noted that the Clamping Band for Bomb Rings which is a steel shoe attached to the outer cir-

cumference of the Bomb Ring by means of a toggle device in order to bind and clamp the ring on the bomb to which it is attached, was actually conceived or discovered by M. W. Swaim, defendant's vice-president in charge of sales. Plaintiff himself made Swaim a co-applicant for the patent on this clamping device.

All the foregoing facts and circumstances would seem to make it indisputable on this record, that so far as the Bomb Ring and Clamping Band therefor are concerned, the defendant never promised to pay plaintiff any royalty or commission on such devices which they manufactured and sold to or for the Government in furtherance of the war effort.

As to the Fin Lock Nut Protector, the trial court found:

"In July, 1943, defendant was requested by the War Department of the United States to develop a protector for a fin lock nut on a bomb. The request was accompanied by a photoprint of a sketch showing a 'Fin Lock Nut Protector,' and its relation to adjacent parts of a bomb. Defendant being in the paper business, the request implicitly suggested that the 'Fin Lock Nut Protector' be made of paper. Upon receipt of the War Department request, Swaim delegated the matter to Byassee. By August 13, 1943, Byassee, together with one Graham, another of defendant's employees, had produced a paper fin lock nut protector of the character subsequently shown and described in the patent application Serial No. 521,225, filed by plaintiff on February 5, 1944. On September 16, 1943, such devices were tested at the Aberdeen Proving Grounds; by September 22 a trial order for several thousands thereof had been placed with defendant; and by September 30 the trial order had been manufactured, shipped to bomb loading plants, and at least one carload of bombs equipped with them. On October 4, 1943, Byassee, in the presence of plaintiff, reported the project at a meeting of the Midwest Paperboard Products Development Bureau."

"Plaintiff was neither consulted about nor informed of the 'Fin Lock Nut Pro-tector' project until after the device had been produced by Byassee, proven in tests, and the trial order completed; and plaintiff testified that his first knowledge or information about the fin lock nut protector was late in October or early in November of 1943."

"There is no inventive difference between the 'Fin Lock Nut Protector' shown on the War Department's sketch and the one produced by Byassee."

"Between September 22, 1943 and August 14, 1945, defendant manufactured and sold to the United States Government, directly and as sub-contractor, large quantities of 'Fin Lock Nut Protectors' as shown in application Serial No. 521,225."

The third invention on which a royalty or commission is claimed is the Ammunition Retaining Cup. It appears from the typewritten report of evidence, though not found by the trial court, that in November, 1943, plaintiff was sent to Washington, D. C. by defendant in order to show them how to make the Distance Wad faster. He invented a new one which became a big success. In his application for a patent on the Ammunition Retaining Cup, the plaintiff advised the Patent Office that the device had been extensively used by the Government without any royalty to him, and that he was happy over that fact.

The uncontradicted evidence in this record shows that the defendant company never manufactured or sold any Ammunition Retaining Cups, or so-called Distance Wads. Plaintiff bases his claim against the defendant on the fact that other companies, with the permission of himself and the defendant, manufactured and sold such devices to the Government. His theory is that some of the paperboard stock which defendant manufactured and sold to such companies was used in the manufacture of Distance Wads made for the United States Government. There is no evidence tending even remotely to support such a claim.

As a matter of fact it is conclusively shown by the evidence in this record that the defendant company never,

at any time agreed either in writing or orally, to pay plaintiff a commission or royalty on the selling price of devices covered by the three patents we have been considering. Consequently there can be no recovery under count one of his complaint.

So far as the allegations in count two of the complaint are concerned, the plaintiff has totally failed to show that any fiduciary relationship existed between himself and the defendant company. The trial court properly found as a fact.

"There is no convincing or even credible evidence that said Otto or said Swaim, or any other representative of defendant, at any time induced plaintiff or Jacob Teller, or either of them to disclose an invention upon any misrepresentation or upon any express or implied promise of pecuniary reward."

Our examination of the record convinces us not only that said finding is supported by substantial evidence, but also that it is the only possible conclusion that can be drawn from the review of all the evidence in this case.

We come now to the order entered by the trial court on the counterclaim of the defendant. There is and can be no dispute that plaintiff was employed by the defendant company as an "idea man." It was his job to devise new uses for paperboard or paperstock manufactured by the Alton Box Board Company. He was to head the research department of defendant's organization. He was authorized to patent at Alton's expense and on Alton's behalf, any inventions or improvements he might make in the paperboard field during his employment.

The rule of law to be applied in such a case is stated in United States v. Dubilier Condenser Corp., 289 U.S. 178, 53 S.Ct. 554, 557, 77 L.Ed. 1114, 85 A.L.R. 1488: "One employed to make an invention, who succeeds, during his term of service, in accomplishing that task, is bound to assign to his employer any patent obtained. The reason is that he has only produced that which he was employed to invent. His invention is the precise subject of the contract of employment. A term of the agreement necessarily is that what he is paid to produce belongs to his paymaster. Standard Parts Co. v. Peck, 264 U.S. 52, 44 S.Ct. 239, 68 L.Ed. 560, 32 A.L.R. 1033."

The plaintiff, Belanger, was acquainted with this principle. When one Wilson, an employee of the defendant who had conceived and developed a "paper license plate," asked Belanger why the patent for such license plate was not taken in Wilson's name, he was told: "It doesn't make any difference whose name it is in, it belongs to the company anyway." The trial court properly granted defendant the relief prayed for in its counterclaim.

Plaintiff's next contention is that he did not receive a fair trial; (a) because he was not allowed to inspect the file of defendant's attorney, Karl K. Hoagland; and (b) because he was not allowed to introduce in evidence the pre-trial depositions of M. W. Swaim and Karl K. Hoagland.

Hoagland was the general attorney for the defendant company. In fact he represented the defendant in this very case until a few days before the trial began, at which time his appearance was withdrawn. He appeared and testified as a witness in the case. As general counsel for the company he had employed a St. Louis patent attorney to draft a proposed contract between Belanger and the Company, and also a revision of that draft made after a conference between Belanger and representatives of the Company. Both the original draft and the revision were produced and received in evidence. Neither was ever signed. Plaintiff claims that in such a case the files are not privileged.

In Dickerson v. Dickerson, 322 Ill. 492, 153 N.E. 740, 743, it was said: "It is essential to the ends of justice that clients should be safe in confiding to their counsel the most secret facts and to receive advice in the light thereof, without peril of

publicity. Disclosures made to this end should be as secret and inviolable as if the facts had remained in the knowledge of the client alone."

In the same case it is said, 322 Ill. on page 499, 153 N.E. on page 742:

"Here Dickerson came to the Morelands not only for the purpose of having a deed prepared by a scrivener, but he came seeking advice, and therefore the rule laid down in Champion v. McCarthy, 228 Ill. 87, 81 N.E. 808, 11 L.R.A.,N.S., 1052, 10 Ann.Cas. 517, and other like cases, that where the transaction between the attorney and client is the preparation of a deed or contract in accordance with the directions of the client, and no legal advice is asked or required the reasons or motives moving the client to make the deed or contract, if stated to the attorney, are not privileged, *does not apply.*"

After all the evidence had been heard, the plaintiff through his attorney, said: "I would like to offer in evidence, solely for the purposes of impeachment, the depositions that were taken at Alton on Oct. 27th, 1948 of Mr. Swaim and Mr. Hoagland."

The Court asked: Did you lay the foundation? Plaintiff's counsel answered: "I can call him back and ask him that."

The Court refused to allow this to be done, saying: "There is going to be an end to litigation."

In Hirsch & Sons Iron Co. v. Coleman, 227 Ill. 149, 81 N.E. 21, 23, the Supreme Court of Illinois laid down the rule proper to be applied under such circumstances.

"The right to recall a witness for further cross-examination is largely within the sound discretion of the trial court, and can be reviewed only when it is apparent that the refusal was a breach of this discretionary power."

"Appellant did not specifically set up what he claimed this witness had stated out of court contradictory to what he had stated in court. For this reason it is impossible to say whether the recalling of the witness would have been of any advantage to appellant."

Plaintiff's contention that he did not receive a fair trial has no better foundation on this record than have the other propositions which he urged on this appeal.

The judgment of the District Court is therefore affirmed.