Ferdinand F. Muenzer, Appellant, v. W. F. & John Barnes Co., Lindsay Light and Chemical Company, S. Becker Treat, William W. Barton and Barton Chemical Co., Appellees.

Gen. No. 10,876.

Second District.
March 2, 1956.
Rehearing denied April 19, 1956.
Released for publication April 23, 1956.

Andrew F. Wintercorn, and Raphael E. Yalden, both of Rockford, for appellant.

Williams, McCarthy & Kinley, of Rockford, for W. F. & John Barnes Co., S. Becker Treat, William W. Barton and Barton Chemical Company, appellees; Winston, Strawn, Black & Towner, of Chicago, for Lindsay Chemical Company, appellee; Douglas C. Moir, and Edward J. Wendrow, both of Chicago, of counsel.

JUSTICE CROW delivered the opinion of the court.

Ferdinand F. Muenzer, the plaintiff, brought this suit against the defendants W. F. & John Barnes Co., a corporation, hereinafter called "Barnes Co."; Lindsay Light and Chemical Company, a corporation, hereinafter called "Lindsay Co."; S. Becker Treat (an employee at one time of the Barnes Co.), hereinafter called "Treat"; William W. Barton (President of the Barnes Co.), hereinafter called "Barton"; and Barton Chemical Company, a corporation, hereinafter called "Barton Co."

The complaint, as amended, contained six counts. The plaintiff alleged that he had been engaged by Barnes Co. to develop a powder for the polishing of optical lenses, on the oral agreement that any discoveries would belong to him. He sought relief on various theories, all of which are fundamentally based on the claims that he later did discover a secret formula for a polishing powder known as "Barnesite," and that it belonged to him pursuant to the alleged oral agreement.

The plaintiff asked for an accounting from Barnes Co. and Lindsay Co. and a judgment for the profits made from the manufacture of Barnesite by these companies and a judgment against Treat, Barton, and Barton Co. for the wrongful disclosure of the formula and for the profits made by those individuals and Barton Co. through their wrongful conduct and that of their agents in allegedly fraudulently obtaining the formula and selling it.

Answers containing general denials were filed by the several defendants except as to certain allegations with reference to the background and qualifications of the plaintiff as an expert in the field of chemistry, to which they plead lack of knowledge. The affirmative defenses of the Statute of Limitations and laches were also pleaded.

The case was heard by the Trial Judge without a jury; at the close of the plaintiff's evidence, the court, on motion, found the defendant Lindsay Co. and the individual defendants Barton and Treat not guilty. At the close of all the evidence, the court entered judgment in favor of the defendants Barnes Co. and Barton Co. From those orders and judgment this appeal is taken.

The plaintiff's theory is (1) that liability existed because of an oral contract between the plaintiff and Barnes Co. that the formula for the polishing powder, when developed, would become and remain the property of the plaintiff; (2) a confidential relationship existed between the plaintiff and Barnes Co., Barton, Treat and Barton Co.; (3) when a confidential relationship is shown, the burden of proof shifts from the plaintiff to the defendants to show a course of fair dealing; and (4) Lindsay Co. had notice of the claim of the plaintiff to the formula before it began to manufacture "Barnesite" and is liable for profits it made in manufacturing Barnesite.

394

The position of the defendants Barnes Co., Barton, Treat and Barton Co. is that, under the circumstances here, the plaintiff, as an employee hired by Barnes Co. to develop a polishing powder formula, is required to prove ownership in himself of the formula by some specific agreement, in order to recover, and that in the absence of such an agreement the same belongs to the employer, not the employee. The defendant Lindsay Co. contended the plaintiff had no right of action against it for the additional reason, inter alia, that the Lindsay Co. acquired knowledge of the formula honestly and prior to notice of the plaintiff's claim of ownership.

The record is quite voluminous and no good purpose would be served by setting out or attempting to summarize all the evidence in detail. Suffice it to say, referring to and summarizing the principal significant portions thereof, that the plaintiff came to this country in 1929 from Germany where he had been employed as a chemist. In 1938, he and the defendants, Barton and Treat, planned to form a company to manufacture inks on Ravenswood Street in Chicago, the plaintiff having the formulae for the inks, but this plan was dropped on account of the country's entry into World War II after Pearl Harbor in December, 1941.

A review of the testimony shows that prior to 1941 the U. S. Army had asked the Barnes Co. to develop a grinding and polishing machine, the principle of which had been brought from Europe. Such a machine was designed by a Mr. Desenberg but there was need for a polishing compound. The defendant Treat, at Barton's request, asked the plaintiff if he would do the research work on a polishing powder and the plaintiff said he would.

Barton, according to the plaintiff, met with him and had a conversation about the polishing powder project for an hour or two in the Dearborn Station in Chicago,

early in 1942, at which time Barton told him that if nothing came of the research work on the polishing powder, that would be alright, the plaintiff would owe nothing to Barton or Barnes Co., and that during the research work on the powder, the plaintiff could not work alone but would be placed on the Barnes Co. payroll and would receive $400 per month, with the understanding that whatever, if anything, was developed in the way of a polishing powder would, when the war was over, belong to the plaintiff; that Barton's primary interest in this project was to further the war effort by supplying that much needed powder to the Government. Barton testified he had no recollection of such a meeting.

Barton testified the first conversation was between Treat, Barton and the plaintiff in February, 1942, prior to the development of the polishing powder formula, at which time Barton outlined the work the plaintiff (as well as Treat) was to do for Barnes Co. and said that "he and Mr. Treat would be employees of Barnes and, as such, such work as they completed would naturally belong to Barnes," to which, Barton said, the plaintiff agreed. A second conversation, Barton says, took place sometime later during the spring at the Ravenswood plant. At this time Treat, Barton, as well as the plaintiff, and Stanton K. Smith, an employee of Barnes Co., were present. Barton testified that he said, in the plaintiff's presence, that "whatever he, Muenzer, had in mind in the polishing field would belong to Barnes." Treat corroborated the first conversation and Treat and Smith corroborated the second conversation. At those conversations, as related by the defendants' witnesses, the plaintiff was evidently assured that he retained ownership of the prior ink formulae, and Barnes Co. made no claim to that matter. The plaintiff, in substance, denies those conversations.

The plaintiff's employment by the Barnes Co. was solely to develop a polishing powder or compound,— that much at least seems to be agreed, regardless of such differences as there are relative to the other terms, and that is what he did from 1942 through 1946.

On one occasion the plaintiff met Barton and Treat in Chicago where Barton introduced him to Mr. Desenberg. Desenberg gave him a small vial of powder which he was told was a sample of the powder used in Europe for polishing lenses. It took the plaintiff about four weeks to duplicate this powder.

The plaintiff continued to work to produce a new powder because that used in Europe was unsatisfactory. Most or all of the testing apparently was done in Rockford where the machines were located and the plaintiff came to Rockford frequently for that purpose. He worked in the laboratory at the Ravenswood address in Chicago until June 1942, at which time it was decided to send a sample of the then current formula for the new material he had developed to Frankford Arsenal. A letter was received by the Barnes Co. from the Arsenal in October 1942, which had high praise for the polishing powder, and it now appeared that a powder had been developed which was far superior to anything on the market, although a subsequently developed edition of the formula was found to be better for controlled commercial production, and the production in large quantities of the final formula was done in Rockford.

In November 1942, the plaintiff was notified that Barnes Co. had purchased a plant in Rockford to manufacture the powder. Shortly thereafter the plaintiff visited Rockford and Barton said it would be the plaintiff's first duty to lay out and equip the plant, which he proceeded to do. The plaintiff says that while he and Barton were walking around the plant about that time Barton told him he would receive 5%–10%

royalty, that is to say, 5%–10% on the selling price of every pound of powder sold. The plaintiff moved from Chicago to Rockford at the beginning of 1943. One time in December 1943, the plaintiff says he asked Barton "How is it with the royalty" and Barton said it was o.k.

In March 1943, the plaintiff was introduced to Messrs. Ingwalson, Hill and John Crain, who had been hired by Barnes Co. to help in the production of the polishing powder which had been given the name of "Barnesite." About two months after the plaintiff's arrival in Rockford, the plant was ready to start production. He had worked out a formula, but had not completed it, and had done the preliminary work for Barnesite in Chicago, at a laboratory where some of the equipment was his but most of the larger equipment was owned by a firm consisting of the plaintiff, Mr. Barton, Mr. Treat, and another, and the rent on which place was paid by Barnes Co. from March or April 1942, until the Rockford plant was established. Barnes Co. also had supplied some equipment for that Chicago laboratory. The formula was used later in Rockford ultimately to produce Barnesite; in Rockford larger batches of powder could be made because larger sized equipment was available; certain testing, experimenting, and checking could be there done that could not be done in Chicago; and the final particular formula which came to be known as Barnesite and was commercially produced was a formula developed in Rockford.

From the outset of the relationship, about March 1, 1942, the plaintiff received $400 per month from Barnes Co. while he worked in Chicago and when he came to Rockford he received $500 per month. This compensation was subsequently increased to $500 per month plus 5% of the net sales of "Barnesite." Under this 5% arrangement the plaintiff received $5,000 in

February 1945, $9,000 in January 1946, $4,017.28 in January 1947, $800 in April 1948, and $2,686.90 in September 1948. The payments in 1947 and 1948 were based on sales had prior to January 1, 1947. Early in 1947, the plaintiff met with Barton. The compensation agreement was changed to $10,000 per year plus 50% of the profits of the Barnes Co. Chemical Division up to $25,000. This arrangement ran from January 1, 1947 to July 1, 1949. The plaintiff, however, received nothing except the salary of $10,000 per year during the latter period. The plaintiff's testimony makes frequent references to the payments under that percentage arrangement. These he repeatedly calls "royalty payments" and like terminology is often used in his brief herein, from which he argues that that terminology imports his ownership of the "Barnesite" formula. The checks for those amounts, however, did not say "royalty payment" on them. One of the vouchers remaining and in evidence, namely, that of January 10, 1947, for the foregoing $4,017.28 payment, says on it "Commission through December, 1945, $4017.28." Stanton K. Smith, the Barnes Co. employee who worked on job classification and wage increases within the framework of the Wage Stabilization Act then in effect, and Barton, testified that the increase to the plaintiff from $500 per month to the percentage arrangement was simply a means of getting him some additional compensation under the law. Barton and Smith deny the use of the term "royalty" in any oral conversations with the plaintiff. And such term was evidently only used one time by any of the defendants themselves in any of the many exhibits, namely, pl. ex. 5, a letter actually written in 1946, but back dated to 1942, from Barnes Co. to the plaintiff, and there that term was used only in the heading, not body thereof; that exhibit is but one segment of a large mass of evidence which has to be weighed in its totality; the body

399

thereof merely says the plaintiff would be employed at a monthly salary, laboratory to be furnished, and if he were successful, Barnes was to pay not to exceed 5% of the net amount of material sold, in addition to his salary; the plaintiff says Barton later said to forget that letter, and the plaintiff later said to Barton it is not our agreement,—so, under the circumstances, we perceive no particular significance in that exhibit or any particular implications to be drawn therefrom; and there is evidence that its purpose was to have in the file and record some ostensible substantiation of the added compensation paid the plaintiff, under the Wage Stabilization law.

On June 15, 1942, the Barnes Co. had written the plaintiff a letter, pl. ex. 12, to the effect, in substance, of confirming a verbal understanding, by which his temporary salary was to be $400 per month for the period necessary to make experiments in the field of developing cerium oxides, until something of a productive nature was had; when successful in producing something which could be used in polishing precision optics his salary would be raised to $500; future compensation to be made when Barnes Co. was able to prove "your invention" to a point where productive capacity could be substantiated from the value of "your product"; if successful, Barnes Co. intended to set up in Rockford a fully equipped plant, he to be the technical director, with commensurate compensation increases to be arrived at when the plant was started, and future adjustments as it grew in productivity. On November 30, 1942 the Barnes Co. wrote the plaintiff again, pl. ex. 13, to the effect, in substance, that because "the products which you have developed" have now been accepted, we are adjusting your compensation in line with our letter of June 15, and from the tests of "your material" it is obvious you have made

400

a distinct contribution as to critically needed precision optics.

In neither of those letters is there specific reference to the legal ownership of and property in the formula or product concerned, and there is no statement the plaintiff is the owner and proprietor thereof. The general language therein "your invention," "your product," "products which you have developed," "your material" was not inappropriate, generally, to identify the thing the plaintiff was working on for Barnes Co. —it was, in that general descriptive, identifying sense, his invention, product, or material, developed by him. But such phraseology was not, we believe, used in any legal sense or with any legal significance or implication as indicating the real, ultimate legal ownership and proprietorship thereof. Where the employer is a corporation or other legal entity, some individual officer or employee obviously has to be the inventor,—the corporation or entity can act in no other way than through individuals,—and, as we later refer to, it is those very inventions, products, or materials of the individual employee which are, under the circumstances indicated below, owned by the employer. The balance of those letters as to the nature of the plaintiff's work, and as to his compensation and the proposed increases therein is generally rather well in accord with what actually transpired,—his work was as therein indicated, and his compensation was increased, but the increases therein, related as they may have been to the sales of the product, do not necessarily or presumptively create or recognize ownership or proprietorship in the formula or product in the plaintiff. There is nothing particularly unusual about a relationship between an employee's compensation,—commissions, or whatever it may be called,— and the sales of the product, and such, without more, does not make the employee the owner or proprietor

thereof. There is no evidence the plaintiff objected to or protested those letters when he received them.

From the compensation received by the plaintiff, social security and withholding taxes were deducted as required with respect to any employee. Shortly after his employment by Barnes Co., the plaintiff applied for group insurance which Barnes Co. maintained for its employees. In the request for group insurance, the plaintiff designated himself as "employee" and Barnes Co. as "employer." In addition, the plaintiff became a member of Barnes Co. Employee Trust, made contributions thereto during his association with the company and withdrew his benefits from the trust on termination of his employment in 1949. During the plaintiff's association with Barnes Co., he received his employee's bonus and on leaving Barnes Co. in 1949 signed a "change notice" which characterized him as an "employee" and the relationship between him and Barnes Co. which was being terminated as "employment." The "change notice" contains the notation "leaving our employment to exploit his particular field," subsequent to which he entered into the business of the production of inks.

The relationship between the plaintiff and the Barnes Co. seems clearly to have been an employee-employer relationship.

The record discloses a striking difference between the plaintiff's treatment of the "Barnesite" formula, as compared to the ink formulae upon which the plaintiff had also worked both before and after the "Barnesite" project. The plaintiff alone knew the ink formulae, but, by his own testimony, no less than four other individuals in Barnes' Chemical Division knew the "Barnesite" formula prior to 1949, and could produce "Barnesite," and, in addition, Treat and Smith were familiar with it. The plaintiff worked in a private, locked room at Barnes Co. in developing and perfect-

ing his ink formulae, after he began working on them again in 1946, but the Barnesite process was common knowledge. Finally in 1946, the plaintiff requested and obtained a written statement from Barnes Co. that he owned the ink formulae, which statement was given to him, because of his concern about working on ink formulae while on the Barnes Co. payroll and using their facilities. But, no attempt was made by the plaintiff to get any such statement with respect to "Barnesite" prior to 1949. The plaintiff's testimony that portions of the "Barnesite" formula were known only to him is in direct conflict with that of Ingwalson, supervisor at one time of production of the powder.

With the termination of World War II, the Chemical Division of Barnes Co. began to lose money. At first Barnes Co. tried to make an agreement with the plaintiff, who was then not working on "Barnesite," as to his ink business, contemplating the continuation of its chemical division, but no arrangement was made. In that connection, some of the references in some of the plaintiff's exhibits of 1949 and thereabouts to "your formulas," etc., apparently had to do with the plaintiff's ink formulae, as to the ownership of which there is no controversy, and do not relate to the polishing powder matter, and were made during the course of the unconsummated negotiations about the ink business. Barnes Co., finally, however, decided to quit the chemical business. Barton Chemical Company was formed to handle the liquidation, and among its assets was the name "Barnesite," copyrighted by Barnes Co. in 1946, and the formula for Barnesite. Barton Chemical Company approached Lindsay Company, which company had been supplying one of the ingredients of "Barnesite," about purchasing the powder making equipment. Early in 1949, certain Lindsay representatives came to the Rockford plant and inspected this equipment. In the course of the inspection they talked

403

to the plaintiff. Notwithstanding that he knew the purchase of the equipment for making "Barnesite" was being contemplated, he made no claim of ownership then of the "Barnesite" name or formula.

As we understand it, the plaintiff's principal complaint as to the alleged wrongful disclosure of the formula lies in the circumstances that in 1949 it was represented to him by Barton that the U. S. Government for security reasons, since Barnes Co. was intending to discontinue manufacturing Barnesite, wanted a written statement of the formula and the details of the process and its production so the same could be preserved in the archives for future use, if needed. Following that, he (with others cooperating) prepared such or the data for such, gave it to Barton or the Barnes Co., to be given the Government, the Lindsay Co. later got a copy thereof, the defendant Treat went to work for Lindsay Co., and the plaintiff says such representations by Barton were not true. It appears, however, that a booklet, pl. ex. 8, containing such a statement was, in fact, prepared, was in fact delivered to the Government, and was in fact desired for those purposes by the Government, so there seems to be no basis for saying there was any misrepresentation in that respect. Further, there can be no foundation for any complaint of wrongful disclosure unless and until the plaintiff has first established in himself the ownership of and property in the formula, so as to be in a position properly to complain of some alleged disclosure concerning his property which, under some circumstances, might be wrongful.

The plaintiff left Barnes Co. about July 1, 1949. Not until March 1950, did the plaintiff give Lindsay Co. notice of his claim of ownership to "Barnesite." Lindsay Co. took over operation of the equipment in Rockford in the fall of 1950 and started to make "Barnesite." They made "Barnesite" in Rockford up

404

to January 1951, at which time it moved the machinery to its own plant in West Chicago.

■ Proof on behalf of the plaintiff by a preponderance of the evidence of the existence of the alleged oral contract between the plaintiff and Barnes Co. that the formula for the polishing powder, if and when developed, would become and remain the property of the plaintiff, must necessarily precede consideration or determination as to any claimed confidential relationship between the parties and before the applicable legal consequences, if any, of that claimed confidential relationship, if it existed, can arise. Unless the existence of such an alleged contract is so established and the ownership of and property in the formula is so vested in the plaintiff, we do not reach the other questions of whether there was a confidential relationship and whether, if so, the defendants or some of them in some manner violated such in dealing with the plaintiff's alleged property. Where one is employed for the express purpose of using his inventive or creative faculty to develop a specific process or product for his employer, there is an implied agreement that any invention or development arising from the employment relating to that process shall be assigned to and belongs to the employer, in the absence of an express contract to the contrary; the invention or creation of a specific thing can be made the subject of a bargain and pass in execution of it: Standard Parts Co. v. Peck (1924) 264 U. S. 52, 68 L. Ed. 560; Quaker State Oil Refining Co. v. Talbot (1934) 315 Pa. 517; United States v. Houghton (1927) 20 F.2d 434 (D. C. Md.); Magnetic Mfg. Co. et al. v. Dings Magnetic Separator Co. (1927) 16 F.2d 739 (C. C. A. 7th); Livers v. Faries Mfg. Co. et al. (1948) 82 F. Supp. 564 (D. C. S. D. Ill.); Belanger v. Alton Box Board Co. (1950) 180 F.2d 87 (C. A. 7th). A rather closely related case is Velsicol Corp. v. Hyman (1950) 405 Ill. 352, where the Court

405

held there was an express written agreement by the employee to assign patentable material to his employer, and that even if there had been no such express agreement the Court in all probability would have held there was an implied contract to that effect, and the Court observed that it was not the intention of the parties that the employer should expend large sums of money for laboratory facilities and equipment so that the employee might experiment and discover objects or ideas which would be his.

Where an employee by contract, oral or written, is hired to make a particular invention or solve a particular problem for the employer, the property in the inventions or creations of the employee, under those circumstances, they being the precise subject of the contract of employment, belongs to the employer; the employee has, in effect, sold, in advance, the fruit of his inventive talents, skill and knowledge, just as much as the fruit of his mechanical skill, to his employer, who is equitably entitled to it; in making such inventions or creations or solving such problems the employee, under such an employment, is merely doing what he was hired to do; if one is employed to devise or perfect an instrument, or a means for accomplishing a prescribed result, he cannot, after successfully accomplishing the work for which he was employed, plead title thereto as against his employer,—that which he has been employed and paid to accomplish becomes, when accomplished, the property of his employer: Solomons v. United States (1890) 137 U. S. 342, 34 L. Ed. 667. See also: Gill v. United States (1895) 160 U. S. 426, 40 L. Ed. 480. The product is necessarily the property of the paymaster employer who engaged the services and paid for them, the product being his inducement and compensation. The principles are recognized in United States v. Dubilier Condenser Corp. (1932) 289 U. S. 178, 77 L. Ed. 1114,

though the facts of that case did not bring it within the principles.

■ Those principles, under such circumstances, may be abrogated only by a specific agreement to the contrary, and the burden of proof necessarily is on the one seeking to prove such contrary agreement: Hirshhorn v. Mine Safety Appliances Co. et al. (1952) 106 F. Supp. 594 (U. S. D. C. W. D. Pa.); aff'd 203 F.2d 279; cert. den. 98 L. Ed. 376. It is not just the employer-employee relationship that entitles the employer to the employee's inventions in those circumstances, but rather the particular and express purpose and nature of the particular employment concerned.

An interesting application of the principles occurred in Phillips v. W. G. N., Inc. et al. (1940) 307 Ill. App. 1, First Dist., where the Court held that the plaintiff employee, a radio script writer, was employed for particular work, namely, to write a script for a radio serial, as ordered by the employer, and under its direction and supervision, that she did the work, that she was paid for it, and that in such a situation the ownership in the result of what was done,—the script,— belonged to the employer, the Court citing inter alia, Solomons v. United States, supra, United States v. Dubilier Condenser Corp., supra, and referring to Standard Parts Co. v. Peck, supra.

The plaintiff refers us to these cases: Bohlman v. American Paper Goods Co. (1943) 53 F. Supp. 794 (D. C. N. J.); Jones v. Ulrich (1950) 342 Ill. App. 16, Third Dist.; Shellmar Products Co. v. Allen-Qualley Co. (1930) 36 F.2d 623 (C. C. A. 7th); Booth v. Stutz Motor Car Co. of America, Inc., et al. (1932) 56 F.2d 962 (C. C. A. 7th); E. I. Du Pont de Nemours Powder Co. et al. v. Masland et al. (1917) 244 U. S. 100, 61 L. Ed. 1016; Gayler et al. v. Wilder (1850) 10 How. 477, 13 L. Ed. 504; Commercial Merchants Nat. Bank & Trust Co. v. Kloth et al. (1935) 360 Ill. 294; Hogg v.

Eckhardt (1931) 343 Ill. 246, and Housewright v. Steinke (1927) 326 Ill. 398.

In Bohlman v. American Paper Goods Co., supra, Jones v. Ulrich, supra, Shellmar Products Co. v. Allen-Qualley Co., supra, and Booth v. Stutz Motor Car Co. of America, Inc., et al., supra, the facts, issues, relationship between the parties, their alleged agreement, if any, and what the plaintiff and defendant were to do and did are quite dissimilar to those involved in the present case; in none of them was there an (inventor) employee-employer relationship; and in all of them there was no question but that the plaintiff, not the defendant, had and owned the right of property in the invention concerned,—which question is directly in issue here and is the very crux of this case,—and the chief problems in those cases were simply what the consequences were of the defendant's learning thereof in confidence and subsequently dealing therewith. E. I. Du Pont de Nemours Powder Co. et al. v. Masland et al., supra, bears no relation to the present case. What the rights of the parties here might be if they were reversed, i. e., put in the position of the parties as in the Masland case, with the Barnes Co. suing to enjoin Muenzer from disclosing an alleged secret process acquired while formerly in its employ, is a matter we need not now decide. Such is not the case at bar. Gayler et al. v. Wilder, supra, we understand to be cited for the proposition that express licenses need not be in writing; although we do not find such in the opinion, it is a matter of no great importance, because such, if assumed to be the law, does not appear materially to aid the plaintiff's case.

The three remaining cases, Commercial Merchants Nat. Bank & Trust Co. v. Kloth et al., supra, Hogg v. Eckhardt, supra, and Housewright v. Steinke, supra, are simply different applications to varying fact situations having no resemblance to the

408

present case of some or all of the well known general principles that where there is a trust, confidential, or fiduciary relationship a party in the position of a fiduciary may not, at the expense of such relationship, deal in the property of the other party for his own profit; the burden is on the fiduciary to show the fairness of any transaction between him and the other party; he must exercise good faith, and not betray the confidence; but where the plaintiff claims the existence of a fiduciary relation it is incumbent on the plaintiff to establish that claim by proof which is clear and convincing, and so strong, unequivocal, and unmistakable as to lead to but one conclusion. Those, undoubtedly, are correct general principles to be applied in a proper case, but the plaintiff does not make clear to us what their application is here, or how they are of any assistance in determining the initial vital question of the ownership of and property in the Barnesite formula here concerned.

We do not believe any of the cases cited to be decisive or persuasive of the present cause.

The plaintiff, therefore, clearly had the burden of proving, by a preponderance of the evidence, a specific contract whereby he was to be the owner of the "Barnesite" formula. No written contract to that effect exists, and the only substantial evidence supporting the plaintiff's contention of an oral contract is his own testimony of a conversation had with Barton in the Dearborn railroad station in Chicago in early 1942. Not only was this conversation contradicted by Barton but also, in effect, by Treat and Smith, all of whom testified to contrary conversations at the Ravenswood Chemical Plant in Chicago some months after the alleged Dearborn railroad station conversation. The additional 1949 and other conversations the plaintiff refers to as admissions by Barton are all uncorroborated except one, are all, in substance,

409

denied by Barton, and the one which was somewhat corroborated by the plaintiff's son is also denied by another defendants' witness. The bulk of the evidence of collateral circumstances or transactions which the plaintiff urges would lend some corroboration to his version is offset by similar and other evidence that the Barnes Co. owned the formula. One highly significant collateral circumstance is that for more than seven years, from March 1942, until June 1949, the plaintiff asserted no rights to the formula. Such prolonged silence upon such an important matter is, under the circumstances, difficult to understand. Moreover, the probability or improbability of the type of alleged oral contract on which the plaintiff relies is, of course, a proper factor for the trier of the facts to consider in weighing the evidence in such a situation as this, and the nature of the plaintiff's claimed contract under which the Barnes Co. would bear all the expenses of the project, yet have no property in or ownership of the formula, if and when developed, and the plaintiff would be the sole proprietor and owner thereof, at liberty to depart his employment at any time, and to sell it or use it or have it patented or trademarked (if possible) in any manner he pleased, does not have a strong ring of probability. It is hardly the type of contract the corporate officers of Barnes Co., responsible to a Board of Directors and stockholders, might reasonably be expected to enter into, and it cannot be assumed or presumed that they did.

■ ■ It is the contention of the plaintiff that it was the understanding that whatever was developed in the way of a polishing powder would belong to him. It is the contention of the Barnes Co., on the other hand, that there was no such agreement and that the formula for "Barnesite" is that of Barnes Co. The evidence on the vital question is obviously in sharp conflict, the plaintiff's evidence tending to support his

410

theory, while Barnes Co.'s evidence tends to sustain their theory, so that a determination of the case turns primarily on that question of fact, and the credibility of the witnesses and the weighing of the evidence are, therefore, of great importance. The Court below, having seen and heard the witnesses, and weighed the evidence, determined the factual issues contrary to the plaintiff's contention. In such a situation, we are not justified in disturbing the findings unless they are against the manifest weight of the evidence: Velsicol Corp. v. Hyman, supra; Phillips v. W. G. N., Inc. et al., supra; Northern Trust Co. v. City of Chicago (1954) 4 Ill.2d 432; Atwood Vacuum Machine Co. v. Varner Well & Pump Co. (1954) 3 Ill.App.2d 571. A study of the record is convincing that the Trial Court committed no error in this respect. From the record and the facts as thus determined, we conclude, as did the Trial Court, that the plaintiff had no title or right or ownership or property in or to the polishing powder or its formula. Under the circumstances, it is unnecessary to discuss the further point as to the position and relationship of the Lindsay Company to the transaction.

The judgment is, accordingly, affirmed.

Affirmed.

DOVE, P. J. and EOVALDI, J., concur.