Arthur J. Long, Plaintiff-Appellee, *v.* Arthur Rubloff & Company, Defendant-Appellant.

(No. 58523; ■■■■■■■■■■■■■■)

First District (2nd Division)—April 8, 1975.

1014

Schuyler, Stough, & Morris, of Chicago, for appellant.

Irving Goodman, of Chicago, for appellee.

Mr. JUSTICE STAMOS delivered the opinion of the court:

Plaintiff, Arthur Long, brought this action against defendant, Arthur Rubloff & Company (hereinafter Rubloff), for breach of an oral agreement of employment and for the "wrongful appropriation" of plaintiff's property. After a bench trial, judgment was entered in favor of plaintiff for $20,000. From that judgment, defendant appeals and contends that: (1) the judgment was against the manifest weight of the evidence; (2) the judgment was contrary to law; and (3) the improper admission of certain evidence constituted prejudicial error.

In a one-count amended complaint, plaintiff alleged, *inter alia*, that in 1967 he was employed by defendant on a month-to-month basis as a real estate broker, salesman, and solicitor; that defendant agreed to pay

plaintiff the sum of $1,000 per month, plus a commission of 10% on all business brought in by plaintiff for the listing and sale of real estate; and that on February 20, 1968, defendant terminated plaintiff's employment without notice, breached the employment agreement, and "wrongfully appropriated" plaintiff's personal files and listings.[1] As a result of the above, plaintiff sought damages, *inter alia*, for 3 days' salary ($150), for failure to give 30 days' notice of termination ($1000), for 2 weeks' vacation pay ($500), for the commission due for the listing of property owned by Libby, McNeil & Libby ($9,750),[2] and for damages sustained due to defendant's taking of plaintiff's personal files and listings ($5,000).[3]

In its answer, defendant admitted that plaintiff was employed by defendant as a solicitor and admitted that plaintiff was entitled to 2 weeks' vacation pay, but alleged that the employment relationship was terminable at the will of either party. Defendant admitted that it retained certain files and lists, but alleged that said files and lists were developed by plaintiff in the course of his employment and were owned by defendant as a result of the employer-employee relationship. The record reveals the following:

Arthur Long testified that he was a licensed real estate broker in the State of Illinois for the past 16 years, specializing in leasing. In March of 1967, he was approached by Thomas Curley, manager of the office leasing department at Rubloff, in regard to a possible employment relationship. Mr. Curley stated that he had recently assumed charge of the office leasing department and needed assistance from someone with experience in the field. The witness told Mr. Curley that he was in possession of a file reflecting a list of buildings with relevant leasing information. Mr. Curley was interested, and subsequently, Mr. Curley and several other men from Rubloff examined the file.

The witness described the file as being approximately 6 inches thick and containing leasing information on 40 to 50 buildings. Each building in the file contained the names of tenants, their lease-expiration dates, the name of the contact, the number of square feet occupied, the amount paid per square foot, whether the tenant contemplated expanding, and

---

[1] In neither the trial below nor in this court has defendant objected to plaintiff's allegations of two separate causes of action in one count. (See Ill. Rev. Stat. 1973, ch. 110, pars. 33(2), 42(3).)

[2] At trial, this amount was amended to $5,050, being 10% of the actual commission of $50,500 received by defendant.

[3] On petition of plaintiff, this amount was increased by $20,000 immediately before trial. The petition sought the additional damages on the theory that "plaintiff has been deprived of the use and the benefit of his listings for the past three years and ten months; that as a result thereof, he has not been able to carry on his regular employment."

similarly pertinent information. Plaintiff stated that he had been compiling the list since 1960 and placed the value of the listings at $25,000.

After exhibiting the file to Mr. Curley, the two discussed the terms of employment. Plaintiff told Mr. Curley that he would require $1,000 per month plus 10% of the commission received on leases or sales generated through plaintiff's efforts. On direct examination, plaintiff stated that Mr. Curley made no reply to his request; on redirect examination, he stated that Mr. Curley specifically told the witness that he would receive a $1,000 a month salary and 10% of all commissions or listing fees which were generated by him. The terms of the contract of employment were never reduced to writing.

Once employed by Rubloff, plaintiff began to set up a program with Mr. Curley. He developed a leasing information form which was approved by Mr. Curley. Plaintiff would fill out the forms by interviewing downtown tenants, and disseminate the data to the appropriate Rubloff salesman or broker who would then "follow up" on the lead. In addition to disseminating information acquired while employed by Rubloff, plaintiff would also utilize the leasing data he had acquired prior to his relationship with Rubloff. Although plaintiff did not know the exact number, he stated that he had provided various leads on prospective tenants which were later consummated into leases by Rubloff brokers. He admitted that he had never received commissions on these leases, but explained that Mr. Curley told him that he would be compensated at the end of the calendar year. He admitted receiving a Christmas bonus, but did not receive a raise in salary at the end of the year as promised by Mr. Curley.

While employed by Rubloff, the witness stated that he had read an article in the newspaper reporting that Libby, McNeil & Libby (hereinafter Libby) was closing its plant in Blue Island, Illinois. He called the attorney for Libby, Mr. James Shannon, and arranged for an inspection of the plant by a Mr. Brown, a fellow employee of Rubloff, and himself. After an inspection of the plant, Mr. Brown wrote to Libby's attorney requesting that the Blue Island plant be listed with Rubloff. The witness stated that he had secured the listing in the sense that no one at Rubloff knew of the property until he brought it to their attention, and that the listing was consummated on February 19, 1968, when he spoke to Mr. Shannon and received a check for $3,000 from Libby for advertising purposes. Although the Blue Island property was subsequently sold for $1,000,000, plaintiff did not receive his commission.

On cross-examination, the witness stated that his purpose in seeking out the Libby transaction was both to show Rubloff his ability in industrial properties and to receive a 10% commission. He admitted that no one had ever told him he would receive a 10% commission on a sale gen-

erated by him, but stated that it was common knowledge in the office that if an employee brought in an outside listing which was later sold by Rubloff, he would be compensated in the area of 10% of the commission. After a short court recess, plaintiff returned to the stand and corrected his earlier testimony by stating that Mr. Curley had promised him a 10% commission at the end of the calendar year. Plaintiff was then impeached by his deposition testimony in which he stated that nobody at Rubloff ever told him that, if he obtained a listing, he would get 10% of the commission.

The day after the listing was obtained from Libby, plaintiff was discharged by Mr. Curley who stated that plaintiff was attempting to take business away from Rubloff. On the same date, plaintiff testified that his files were removed from his office. He protested the taking of his files and informed Mr. Curley that the files contained the leasing information which he brought with him to Rubloff. Mr. Curley, however, stated that the files were the property of Rubloff, and that plaintiff was not entitled to their return.

After his discharge from Rubloff, plaintiff worked for various brokerage houses, but was unable to obtain a position as a leasing agent, because the lists and files which Rubloff had appropriated were his "tools of the trade."

The next witness, James Shannon, testified that he is an attorney, and that in 1967 he handled all the real estate activities for Libby. In December of that year, he was called by plaintiff who stated that he was a broker with Rubloff and wanted to discuss a possible listing on the Blue Island property. Shannon stated that he would be interested in discussing the matter with Rubloff, but that he was also considering several other real estate brokers. Long met with Shannon in January 1968 and discussed the proposed listing. Shannon told Long that he would require a proposal from Rubloff, and to that end, made arrangements for Long and Brown to inspect the property. Prior to the meeting with Long, Shannon did not have any other contacts with Rubloff. Rubloff submitted the required proposal, and, after some negotiations, an exclusive listing agreement was entered into between Libby and Rubloff. In his opinion, Long was the originator and initial negotiator of the listing.

On cross-examination, the witness stated that Rubloff had once sold a piece of property in Hammond, Indiana, for Libby. Although this transaction occurred prior to Shannon's association with the real estate activities of Libby, he noted that a Mr. Brown had handled the earlier listing. The witness also stated that Rubloff, along with several other brokers, was under consideration previous to the telephone call from

Long. At this state, however, nothing had been crystalized and every major broker was under consideration.

Donald Lebold, plaintiff's next witness, stated that he had been a real estate broker for 12 years, presently specializing in sales development and management of residential and commercial properties. For 6 years he was vice-president of a real estate firm which specialized in office leasing and development. Prior to that, he had worked for Rubloff for 5 years as a manager, salesman, and broker.

He became acquainted with Long in 1960 and periodically had occasion to view Long's leasing file until 1966. Long's files were "extensive," approximately a foot thick, and contained not only the pertinent leasing data, but were categorically arranged by the type of building occupied. The witness testified that he had a file similar to Long's which took 8 years to prepare and compile, but he was not allowed, on defendant's objection, to state his opinion as to the value of either of the files.

On cross-examination, it was established that plaintiff was presently employed by the witness as a general broker.

Robert Murphy, called as a witness for plaintiff, stated that he is a real estate broker and had known plaintiff for 7 years. In 1967, when he was employed by station WCFL in Marina City, Long contacted him regarding a new location for the station. During their conversation, Long produced his leasing file which was approximately 4 to 5 inches thick.

John O'Reilly testified that he had an advertising agency at a building which was managed by plaintiff. Between 1961 and 1966 he frequently would have lunch with Long. The first time the witness saw Long's files was in 1961 when the two were discussing various leads in properties. At that time, the witness suggested that Long arrange his leasing information in book form. O'Reilly had, on numerous occasions, viewed the file because there was some discussion of having it published. In 1966, the file was approximately 5 to 6 inches thick.

The last witness for plaintiff was Robert Woodward. He testified that he met plaintiff in 1961 when the latter had obtained office space for him. He had observed, on various occasions, Long's listing files.

Thomas Curley, testifying for defendant, stated that he was employed by Rubloff from 1966 to 1971 as manager of the Office Leasing Department. In February of 1967, he discussed with Long a possible employment relationship. He informed Long that, if he joined Rubloff, it would be in the capacity of a "solicitor" or "canvasser," and his responsibility would be to contact prospects for office leasing by telephone and in person. Long stated that he would require a salary of $1,000 a month, but did not mention anything about commissions. The witness informed Long that

he would have to obtain the approval of the executive vice-president, Abel Berland, and that Long would be on straight salary. The terms of employment were embodied in an interoffice memo sent by Curley to the executive vice-president of Rubloff. The memo, introduced into evidence, provided:

> "We have employed Art Long as a solicitor for the leasing department effective 3/6/67 at a salary of $1,000 per month—(there is no incentive arrangement as with brokers.)
>
>      *     *     *     *
>
>                    /s/ T.F.C."

The witness stated that Long would secure information on prospective tenants, record the information on forms, and forward the data to the listing broker. At one point, Long requested a commission on any lease for which he provided the lead. The witness replied that a commission would not be in order because of the nature of the relationship with the leasing brokers, but that he would recommend a bonus at the end of the year. In his opinion, Long was very competent as a solicitor. At another point, Long requested a transfer to the industrial department, and attempted to get involved in other office business which detracted from his soliciting responsibilities. The witness repeatedly mentioned this to Long, and finally, in February of 1968, terminated him. He told Long that his termination was necessary because he had received reports from other employees that Long was constantly harassing them on a variety of subjects not dealing with his employment and that several clients had reported that Long attempted to solicit business away from Rubloff for his own use.

Upon terminating Long, the witness arranged for one of the employees to remove the records from Long's office. The records consisted of the forms and lists of prospective leasing arrangements which were prepared by Long while he was employed by Rubloff.

Arthur Rogers, a builder and developer, testified that in 1967 he had a 5-year lease and management agreement with Rubloff. He met Long on one or two occasions for the purpose of discussing the leasing program. During these discussions, Long intimated that he would like to work for Rogers. Rogers interpreted the statement as one of disloyalty and requested Jack Coens, an officer at Rubloff, to replace Long.

Jack Coens testified that prior to 1969 he was employed by Rubloff. In 1968, Rubloff had dealings with Arthur Rogers, and Long was assigned by the leasing department to be the solicitor for one of the buildings owned by Rogers. Coens corroborated Rogers testimony that the latter wanted Long replaced because of Long's disloyalty to Rubloff. He wrote a memo, dated February 19, 1968, advising Thomas Curley of the incident.

He also stated that he was familiar with the position of solicitor, and that a solicitor was hired at a fixed salary.

William Brown, Jr. testified that he had been employed by Rubloff for the past 17 years, and was involved in sales, leases, and developments of industrial-type properties. He was acquainted with Long because of the proximity of their offices at Rubloff. In the fall of 1967, Long approached him and stated that he would be interested in working for the industrial department.

Brown was familiar with Libby, McNeil & Libby, having sold a parcel of real estate for them in 1962. In 1968 Long approached him and related that Libby had a plant for sale in Blue Island, and that he had arranged for a meeting with Mr. Shannon. Long and he then inspected the property, and Brown submitted an opinion letter to Shannon requesting an exclusive listing on the property. In his opinion, Long produced the prospective customer, but he obtained the listing.

Brown was familiar with the position of solicitor, that being his first position at Rubloff. A solicitor did not receive a listing or finder's fee for leads on prospective sales or leases. The witness stated that he had an interest in the case in that he received a percentage of the commission on the Libby transaction.

John Reisinger testified that he is currently employed by Rubloff as an industrial real estate broker, but started out as a solicitor in the office leasing department. As a solicitor, he received a salary but no commissions or finder's fees. When he left the position of solicitor, all information which he had acquired regarding prospective tenants was turned over to the head of the office leasing department.

Stewart Scott testified that he is presently employed by Rubloff as a real estate executive. When he was a trainee, he was under the supervision of Tom Curley in the office leasing department. For a time, his duties included those of a solicitor or canvasser. All the information he obtained in regard to leases was recorded on file cards and became part of the company records. He was a salaried employee and did not receive commissions.

On February 20, 1968, Tom Curley requested him to obtain possession of any records or documents in the office occupied by Long. The files which he took were in manila folders which belonged to Rubloff. He did not observe the contents of the manila folders, and did not remember a loose-leaf binder about 4 or 5 inches thick.

On cross-examination, he admitted that he once received a finder's fee of $15,000 while working on a salary. This represented 10% of the gross commission paid to Rubloff. He explained that the only reason he received the finder's fee was that his father-in-law was involved in the

transaction, and that Rubloff had a policy of granting 10% of the gross commission when the employee brought in the deal through family or friends.

At the conclusion of the trial, judgment was rendered in favor of plaintiff for $20,000. Defense counsel asked the trial judge if he "wished" to make any findings of fact or state how the damages were computed. The court denied both requests.

■■ No special findings of fact or propositions of law are necessary to support the judgment or as a basis for review in a nonjury case (Ill. Rev. Stat. 1973, ch. 110A, par. 366(b)(3)(i));[4] and the appellee is permitted to endeavor to sustain the judgment of the trial court by any argument, for any reason, and upon any basis in the record showing that the judgment was proper. (*Chertack v. Santangelo*, 6 Ill.App.3d 201, 285 N.E.2d 209.) For on appeal, every reasonable intendment not negatived by the record will be indulged in support of the judgment. (*Skolnick v. Nudelman*, 71 Ill.App.2d 424, 218 N.E.2d 775.) Consequently, defendant in this appeal assails each cause of action alleged and each element of damages specified in plaintiff's amended complaint and pretrial petition to increase the *ad damnum*. We turn first to the claims arising from the contract of employment.

Both parties to this appeal agree that Long was hired pursuant to a verbal agreement which did not specify any definite term of employment. They disagree on the terms of employment and the legal consequences of Long's termination on February 20, 1968.

■■ We initially dismiss the contention that plaintiff was not entitled to 2 weeks' vacation pay. In its answer, which was not subsequently amended, defendant specifically admitted liability for 2 weeks' vacation pay. An admission in an answer constitutes a judicial formal admission, conclusive as to the admitted fact on the person making it. (*Coss v. Magdziasz*, 65 Ill.App.2d 40, 212 N.E.2d 717; *Gowdy v. Richter*, 20 Ill. App.3d 514, 314 N.E.2d 549.) Thus, defendant's specific admission is binding and it may not now disclaim the $500 liability.

■■ We find merit, however, in defendant's assertion that the evidence does not support the alleged damages of $1,000 for failure to give

---

[4] Although not required, it is the better practice for the trial court to set forth its reasons for arriving at the judgment it makes. Otherwise, the parties, and the reviewing court, are without the benefit of the trial court's conclusions and are left to conjecture about the basis for its judgment. (Supplement to Historical and Practice Notes, S.H.A., 1974 Supp.; ch. 110, par. 64.) This is especially true when, as here, the parties allow two separate causes of action and various elements of damages to be alleged in a one-count complaint. Here, absent the aid of presumptions, it would be impossible to determine if the trial court found for plaintiff on both the contract and conversion claim or merely on the conversion claim alone.

30 days' notice of termination and of $150 representing salary for the 3 days subsequent to plaintiff's discharge. Although plaintiff maintains that these elements of damages were proved at trial, we are referred to no authority nor are we given any reasons for the assertion. There appears to be no dispute that although Long was hired at a monthly salary and paid twice a month, no definite term of employment was specified. Under these circumstances, plaintiff is not entitled to compensation for a period beyond the actual date of discharge. In this State, the rule has long been established that a hiring at a monthly or annual salary, if no duration is specified in the contract, is presumed to be at will and either party may terminate the hiring at his pleasure without liability. *Atwood v. Curtiss Candy Co.*, 22 Ill.App.2d 369, 161 N.E.2d 355.

As earlier stated, although no findings of fact were made, it must be presumed that the trial court found that plaintiff's contract of employment provided for the payment of a commission of 10% on all business brought in by plaintiff for the listing and sale of real estate. It is defendant's position that such finding is against the manifest weight of the evidence. In support thereof, defendant submits that the position and duties of solicitor within the leasing department at Rubloff were well defined. A solicitor was responsible for compiling information on office space needs by canvassing tenants in Loop area buildings. The solicitor would attempt to gather such information as the total space leased by the particular tenant, whether there was need for additional space, the current rental, when the lease expired, and who in the company was responsible for deciding whether to renew the lease or to look for additional space. The solicitor would then pass this information on to other brokers or salesmen at Rubloff for a "follow up." Thomas Curley, Jack Coens, William Brown, Jr., John Reisinger, and Stewart Scott all corroborated the position and duties of a solicitor. The position was a salaried one, and, because of the nature of the relationship with the leasing brokers, commissions were not paid to solicitors. Plaintiff maintained that he was not hired as a solicitor and that he never heard the term used at Rubloff. This, defendant contends, is untenable in light of plaintiff's verified complaint in which he alleged that he was hired by Rubloff, in part, as a solicitor.

That the terms of employment did not include the payment of commissions is reinforced, defendant argues, by the interoffice memo written by Curley contemporaneously with the hiring of plaintiff. The business record sought the concurrence of Curley's supervisor for Long's hiring, and stated that Long was to be hired as a solicitor at a salary of $1,000 per month with no incentive arrangement. Defendant concludes that the above evidence, coupled with plaintiff's contradictory testimony, negates

any finding that plaintiff's contract of employment provided for commissions.

■■ On appeal, this court is required to review cases not only as to the law but also as to the facts, and it is our duty to review evidence and to reverse the judgment of the trial court whenever such judgment is clearly against the manifest weight of the evidence. (Ill. Rev. Stat. 1973, ch. 110A, par. 366.) In an action for breach of a contract of employment, the burden of proving the existence of a contract and all the facts essential to the cause of action is upon the person who asserts the contract. (*Dick v. Halun*, 344 Ill. 163, 176 N.E. 440.) A burden corresponding to that of the proving of the existence of the contract exists as to the proof of its terms. (17A C.J.S. *Contracts* § 579(b) (1963); *Continental Illinois National Bank & Trust Co. v. National Casket Co.*, 27 Ill.App.2d 447, 169 N.E.2d 853.) It was therefore plaintiff's burden to establish that by the terms of his contract, he was entitled to 10% of the commission on sales procured through his efforts.

In this regard, the case made by plaintiff's testimony is neither clear nor satisfactory. On direct examination, plaintiff stated that he requested a 10% share in commissions but Curley did not reply. On cross-examination, he stated that no one ever told him that he would receive a commission on the Libby transaction, but that it was "common knowledge" in the office that an employee would be compensated "in the area of 10%" of the commission on an outside listing which was brought in by him. It was only after a short court recess that plaintiff corrected his earlier testimony by stating that Curley had promised him a 10% commission at the end of the calendar year. At this point, he was impeached by his deposition testimony in which he stated that nobody at Rubloff ever told him that, if he obtained a listing, he would get 10% of the commission. Finally, in his redirect examination, plaintiff stated that in their March 1967 conversation, he was specifically told by Curley that he would receive 10% of all commissions or listing fees which were generated by him.

■■ The terms upon which plaintiff was employed were crucial to plaintiff's case. Yet, even if undisputed, we do not regard plaintiff's testimony as very clear and satisfactory in proving the terms of the contract. Had his evidence on this point been direct and internally consistent, the mere fact that it was sharply controverted, both directly and circumstantially, would not justify a reversal of the trial court's finding. But when, as here, plaintiff's testimony is weak, inconsistent, and contradicted by a substantial body of evidence, the presumptive finding of the trial court cannot be sustained. This court is always reluctant to disturb the findings of the trial judge who saw the witnesses and heard them testify, but under the posture of the present case, we can only hold that any

finding that plaintiff was entitled to commissions, either as to leases or as to the Libby sale, under the contract of employment was contrary to the manifest weight of the evidence.

We turn next to the contention that plaintiff is not entitled to damages for defendant's taking of lists and files from Long's office. In support of its position, defendant asserts that the information and records compiled by an employee as part of his job, at the direction of the employer and for use in the employer's business, are property of the employer and may be retained by the employer upon termination of the employment relationship. (See *Muenzer v. W. F. & John Barnes Co.,* 9 Ill.App.2d 391, 133 N.E.2d 312; *Fremont Oil Co. v. Marathon Oil Co.* (1963), 26 Ohio Op.2d 109, 192 N.E.2d 123.) Although the above is correct as an abstract proposition of law, defendant has failed to demonstrate its application to the present facts. Defendant asserts that the files and lists which were taken from Long's office were the property of Rubloff. Defendant, however, apparently ignores the testimony of plaintiff that the files which were removed from his office included those which he had compiled previous to his employment with Rubloff. There was no testimony that the terms of employment included the sale to Rubloff of Long's personal lists and files; and in the absence of an agreement to the contrary, we are unaware of any rule which would deprive an employee of his personal property merely because its use during the employment relationship accrued to the benefit of the employer. Taken as a whole, the evidence was merely conflicting, and we cannot say that its resolution in favor of plaintiff was against the manifest weight of the evidence.

■■■ The remaining question is whether the award of damages is sustained by the pleadings and the evidence. Generally, the measure of damages for conversion is the market value of the property at the time of conversion. (*Sturges v. Keith,* 57 Ill. 451.) Certain property—property which is not an ordinary object of commerce or is otherwise unique—is, of course, not susceptible to the general measure of damages. The fact that personal property has no market value does not restrict the recovery to nominal damages only; its value or the plaintiff's damages must be ascertained in some other rational way and from such elements as are attainable. *Flynn v. Zimmerman,* 23 Ill.App.2d 467, 163 N.E.2d 568.

■■■ In the present case, plaintiff's leasing data was not an ordinary object of commerce in the sense that an ascertainable market value could be attributed to it. Furthermore, the nature of the thing converted was not such as to make production or replacement cost a viable alternative. (See *Lee Shell Co. v. Model Food Center, Inc.,* 111 Ill.App.2d 235, 250 N.E.2d 666.) Yet, the leasing data allegedly was of a commercial and economic value to plaintiff. Given its peculiar nature, we believe that

the proper basis for determining compensatory damages is its actual value to plaintiff, and that plaintiff was entitled to demonstrate its value to him by such proof as the circumstances admit. But the burden of proving the value of property converted is upon the plaintiff (*Hart v. Evans*, 330 Ill.App. 385, 71 N.E.2d 546), and the evidence must afford some reasonable and proper basis for ascertaining value. At a minimum, it must rise to the dignity of proof, and supply such elements or standards for measuring value to enable the trier of fact to exercise its judgment.

The theory of damages, as set forth in plaintiff's petition, was that plaintiff was deprived of an economic benefit in the nature of lost profits. In this regard, the only evidence adduced by plaintiff was his opinion that the reasonable value of the leasing data was $25,000. An analogous situation was presented in *Lee Shell Company, Inc. v. Model Food Center, Inc., supra.* There, plaintiff brought an action for the conversion of plans and designs for the layout of a shopping center. The plans had no market value, and the only evidence presented on the question of value was the opinion of one of the corporate plaintiff's officers. This court held that the evidence, absent an adequate foundation, was insufficient to establish damages.

Similarly, other than plaintiff's opinion, there was absolutely no testimony from which the trier of fact could determine the value of the leasing data to plaintiff. No testimony was offered to show what value the leasing data had been to plaintiff in the past, what commissions, if any, were made by use of the data, or other testimony to show how possession of the book economically benefited plaintiff. The circumstances here, as framed by the pleadings and the nature of the property involved, admitted of facts which would be probative of the property's value. However, plaintiff's opinion, unsupported by the requisite foundation, was insufficient to establish damages.

■■ When a reviewing court determines that a finding in a nonjury case is against the manifest weight of the evidence, it will reverse and remand for a new trial. (*In re Application of County Collector*, 131 Ill. App.2d 509, 266 N.E.2d 383.) Accordingly, the judgment is reversed and remanded for further proceedings not inconsistent with the views herein expressed.

Reversed and remanded.

. LEIGHTON and HAYES, JJ., concur.