MARK LEITH *et al.*, Plaintiffs-Appellees and Cross-Appellants, v. ANDREW
E. FROST, Defendant-Appellant and Cross-Appellee.

Fourth District   No. 4—07—0964

Argued December 9, 2008.—Opinion filed December 31, 2008.—Rehearing
denied January 28, 2009.

Nick F. Burgrabe (argued), of Lincoln, for appellant.

Robert T. Varney, Melinda Podgor, Colleen Hammond, and Carlos Andres Padua (argued), all of Robert T. Varney & Associates, of Bloomington, for appellees.

JUSTICE APPLETON delivered the opinion of the court:

Plaintiffs, Mark and Mindy Leith, sued defendant, Andrew E. Frost, for tortious damage to their personal property, a dachshund named Molly. In a bench trial, plaintiffs presented evidence that defendant's Siberian husky, Cosmo, intruded into their backyard and attacked Molly. The trial court found in plaintiffs' favor but awarded them only $200, Molly's fair market value, rather than the $4,784 in veterinary expenses they were seeking. Plaintiffs appeal from the award of damages, and defendant appeals from the finding of liability. To prevent the award of damages from being merely nominal, we modify the trial court's judgment so as to award plaintiffs $4,784 in damages. Otherwise, we affirm the judgment.

## I. BACKGROUND

Defendant lived next door to plaintiffs on North Jefferson Street in Lincoln. His backyard was enclosed by a wooden stockade fence six feet high. Inside this fence, he kept his three Siberian huskies, one of which was named Cosmo. Plaintiffs' backyard also was enclosed by a wooden stockade fence six feet high. The two fences almost abutted one another; they were four or five inches apart. Plaintiffs owned two dachshunds, one of which was named Molly. Often, plaintiffs let their dachshunds out of the house and into the backyard. The huskies dug under the fences, trying to get into plaintiffs' backyard, but the parties filled the holes with dirt, rocks, and bricks.

Mindy Leith testified that on April 27, 2006, she came home and let the two dachshunds out into the backyard. Then she went back into the house and unloaded groceries. She heard one of the dachshunds yapping, and when she ran outside, Cosmo was in the backyard—not defendant's backyard but plaintiffs' backyard. He had Molly pinned down in a flowerbed, and he was mauling her as if to "gut" her. Mindy recognized Cosmo because she had seen him in the past by looking over the fence. As Mindy delivered kicks to Cosmo, Molly used her front feet to drag herself under some patio furniture. With Cosmo lunging and snapping under the patio furniture, Mindy pulled Molly out and carried her into the house. The other dachshund followed them inside. Mark Leith came home and used a rake to chase Cosmo out the front gate.

Mindy took Molly to a veterinarian in Atlanta, Illinois, and, from

there, to the veterinary teaching college at the University of Illinois in Champaign. On the way to Champaign, Mindy called defendant and told him that the estimated cost of treating Molly's injuries would be $4,000 with $2,000 down. According to her, defendant admitted he was responsible, and he agreed to pay the veterinary expenses. Mindy testified she would have taken Molly to the University of Illinois in any event. The veterinary bills totaled $4,784, all of which plaintiffs paid out of pocket, the first $2,000 with a credit card and the rest in installments.

On cross-examination, Mindy admitted she had never approached close enough to defendant's dogs to pet them. The huskies had been next door since April 1, 2006, and she had seen them by looking over the fence. She also had seen them when they stuck their snouts through the holes they had dug or when they were jumping. She testified: "I was outside mowing my yard[,] and the same dog was jumping over the very front of the fence ***." She did not see Cosmo enter her backyard on April 27, 2006, but because all the holes under the fence had been filled, she believed that Cosmo "definitely came over the fence."

Defendant testified that before he moved next door to plaintiffs, he lived with his parents on Oglesby Street and Cosmo twice escaped from a chain-link kennel at that address. "[H]e stuck his nose in the corner and was able to lift it up and sneak under." At North Jefferson Street, defendant realized his dogs had dug under the fence when he received "a complaint from [Mindy] about seeing [his] dog's nose underneath the fence." Actually, Mindy called his mother, who in turn called him. He then "dug a little trench about a foot wide and put two layers of bricks in the trench along the fence," in between his fence and plaintiffs' fence.

Before the incident on April 27, 2006, Cosmo escaped from defendant's backyard on North Jefferson Street either once or twice, depending on how one interprets defendant's testimony. The first time, Cosmo escaped by breaking a plank off the fence and "squeez-[ing] out." In the following testimony, defendant seemed to be describing another escape:

"Q. Prior to the accident[,] had any of your dogs ever jumped over the fence in your backyard?

A. No.

Q. Ms. Leith testified that she had seen your dogs kind of jumping high prior to the accident. Why were they—do you know how they were able to jump so high?

A. Whenever I moved in[,] I wasn't thinking clearly[,] I guess[,] and I put the dog[ ]house right up against the fence ***, and they

were able to jump up and get their paws above and come over[,] and then I got a call[,] or my mom got a call[,] from Ms. Leith stating what was going on. So I went home and instantly moved the dog[ ]house away[,] and it has never been there since."

Twice in his testimony, defendant mentioned Mindy's calling his mother instead of him, and Mindy also mentioned calling defendant's mother because he was not easy to reach. Apparently, he put in a lot of hours working. In addition to student-teaching in Springfield, he had been holding down two jobs, one at Kroger and the other at Federal Express. Therefore, by his own admission, "[t]he amount of time that [he was] actually home to see what [his] dogs were up to was pretty limited."

On April 27, 2006, defendant got off work at Kroger at 7:30 p.m. He rushed home and changed clothes because he was expected for supper at his parents' house at 7:45 p.m. He came out of his house and got into his truck, and "Mindy came pounding on the back of [his] truck[,] yelling and screaming about how [his] dog ate her dog and she was going to kill [his] dog." Defendant "was ready to speed away to [his] parents' house," and he did not check on his dogs at that time. He had never known the dogs to be vicious toward man or beast; he had never known them to even bark at plaintiffs' dogs. He denied admitting fault or agreeing to pay any veterinary bills; the most he told Mindy was he would "see what [he] could do." As it turned out, Cosmo was not in defendant's backyard when defendant left for his parents' house that evening. Cosmo returned home about an hour after Mindy left for the veterinarian's office in Atlanta. He had no blood or injuries on him.

According to defendant, a couple of other dogs in the neighborhood somewhat resembled Cosmo. Plaintiffs' fence was 15 years old and deteriorating. In fact, a plank on it fell apart as he was constructing his own fence, and he went ahead and put a new plank up to replace the old one. Three months after the incident, defendant was in his backyard, taking care of his dogs, when he "overheard Mark Leith cussing up a storm about how his [(Mark's)] dogs were digging along the fence."

Defendant called Sharon Raleigh, who testified she had been operating a kennel in Armington for 12 years. She bred several kinds of dogs. About one-third of her business was dachshunds. She testified she was familiar with the value of dachshunds at various ages because she sold them in her business. The trial court allowed her to testify as an expert on the value of dachshunds. Raleigh opined that in Logan County on April 26, 2006, the fair market value of a dachshund such as Molly—a smooth-furred, shorthaired, red-fawn, spayed female

dachshund in good health, 7½ years old, and used as a pet rather than as a show dog or breeding dog—was between $150 and $200. When dachshunds in Raleigh's kennel reached Molly's age, she either gave them to Dachshund Rescue or sold them to friends for $100 to $200. All the dogs Raleigh sold were intended to be pets.

In a written opinion, the trial court found defendant to be "negligent in failing to secure his dog Cosmo within the confines of his backyard, thereby resulting in his dog injuring the [p]laintiffs' dog." The court was "unable to find," however, "that the [d]efendant [had] agreed to pay for the veterinary bills incurred by [p]laintiff[s]." On the issue of damages, the court reasoned as follows:

> "Under Illinois law, a dog is considered personal property. [Citation.] The cost of repairs to personal property is usually the measure of damages, but when the cost of repairs exceeds the fair market value of the personal property, the value of the personal property becomes the ceiling on the amount of damages which can be recovered. [Citation.] Therefore, damages are limited in this cause to $200.00."

Plaintiffs filed a motion to reconsider the amount of damages, and defendant filed a motion to reconsider liability. The court declined to change its decision on either issue.

These appeals followed.

## II. ANALYSIS

### A. Liability

#### 1. *The Identity of the Attacking Dog*

■ Defendant argues that "the manifest weight of the evidence did not show that Cosmo was the dog that attacked Molly." This argument misstates the standard of review. If we asked whether the manifest weight of the evidence *supported* the trial court's factual findings, our standard of review would be *de novo*. Instead, we are to ask a deferential question: whether the court's factual findings or conclusions are *against* the manifest weight of the evidence. *Dargis v. Paradise Park, Inc.*, 354 Ill. App. 3d 171, 177, 819 N.E.2d 1220, 1227 (2004). A conclusion is against the manifest weight of the evidence if the opposite conclusion is apparent from the record. *Bazydlo v. Volant*, 164 Ill. 2d 207, 215, 647 N.E.2d 273, 277 (1995). A finding is against the manifest weight of the evidence if the finding is unreasonable, arbitrary, or not based on evidence. *Bazydlo*, 164 Ill. 2d at 215, 647 N.E.2d at 277. The court concluded that plaintiffs had proved, by a preponderance of the evidence, that Cosmo attacked Molly. The opposite conclusion—that plaintiff failed to so prove—is not apparent from the record. The court found that Cosmo attacked Molly. That

finding is not unreasonable, arbitrary, or lacking in any evidentiary basis. Plaintiffs and defendant had been next-door neighbors for three weeks. Mindy Leith testified she had looked over the fence and had seen Cosmo. She testified she stood over Cosmo as Cosmo mauled Molly.

Because Mindy never actually witnessed Cosmo enter her backyard, defendant argues it was merely her speculation that Cosmo came over the fence. Defendant argues that Mindy never got a good look at Cosmo prior to the incident and that while Molly was being attacked, Mindy was in no physical or emotional condition to clearly identify the attacking dog. Defendant argues "it is very likely that another dog entered [plaintiffs'] yard and attacked Molly." Plaintiffs' fence was deteriorating, and their own dogs "had a propensity to dig holes under the fence," through which the attacking dog could have entered. Other dogs in the neighborhood "looked very much like Cosmo," and it was "purely circumstantial" that Cosmo was missing at the time of the incident.

Defendant made these arguments to the trial court, and, evidently, the court did not find them to be persuasive. Just because arguments like these can be made against a finding, it does not follow that the finding is unreasonable, arbitrary, or devoid of evidentiary support. Cosmo was out of his fenced enclosure. Mindy had seen Cosmo in the past, and she testified she saw Cosmo attacking Molly. The court could have reasonably found that Cosmo was the attacking dog.

## 2. Negligence

According to defendant, the evidence at trial "showed clearly that [he] acted at all times with due care when confining his dogs." He erected a fence six feet tall to keep his dogs in his yard. He moved the doghouse away from the fence so that the dogs could not use it as a platform for leaping over the fence. When Mindy complained that his dogs were digging under the fence, he immediately dug a trench a foot wide along his fence and filled it with bricks.

Nevertheless, Cosmo did escape from the fenced enclosure, and defendant offered no explanation for the escape. At trial, he seemed to take the position that the means of escape was an insoluble mystery and that unless plaintiffs could penetrate the mystery, they could not prove negligence on his part. This was defendant's dog and defendant's fence. The dog was a husky, a good-sized dog. One would think that the route of escape would be detectable to someone who carefully inspected the premises. There are only three ways a dog can get out of a fenced enclosure: either by going under it, through it, or over it. Defendant insisted at trial that it was impossible for his dogs to leap

the six-foot-high fence. It must follow that there was a hole under or in the fence the existence of which defendant was not admitting or which he had not yet taken the trouble to discover. Alternatively, there were no holes under or in the fence, and Cosmo jumped over the fence—in which case, defendant should have been observant enough to know how high his dogs could jump. Mindy testified she had observed defendant's dogs jumping higher than the fence. We uphold the finding of liability.

## B. Damages

■ The trial court reasoned that under Illinois law, a dog is considered to be personal property. *Jankoski v. Preiser Animal Hospital, Ltd.*, 157 Ill. App. 3d 818, 820, 510 N.E.2d 1084, 1086 (1987). The cost of repairs to personal property is usually the measure of damages, but when the cost of repairs exceeds the fair market value of the personal property, the value of the personal property becomes the ceiling on the amount of damages which can be recovered. *Wall v. Amoco Oil Co.*, 92 Ill. App. 3d 921, 924, 416 N.E.2d 705, 708 (1981). The court awarded plaintiff damages in the amount of $200, the amount of Molly's fair market value, according to Raleigh's testimony.

Even if it were true that anyone would pay $200 for a 7¹/₂-year-old dachshund that is not a show dog, the reality is that Molly had merely nominal value at the time of the injury. A reasonable person in defendant's position should have reasonably foreseen that if his dogs escaped from their enclosure and injured plaintiffs' family pet, plaintiffs would feel compelled to pay considerably more than a nominal amount for veterinary care. It is common knowledge that people are prepared to make great sacrifices for the well-being and continued existence of their household pets, to which they have become deeply attached. They feel a moral obligation toward these animals. Emotionally, they have no choice but to lay out great expenditures when these animals suffer a serious physical injury.

Illinois courts recognize that certain items of personal property, such as heirlooms, photographs, trophies, and pets have no market value. *Jankoski*, 157 Ill. App. 3d at 820, 510 N.E.2d at 1086. Damages for harm to such items of property are not restricted to nominal damages. "[R]ather, damages must be ascertained in some rational way from such elements as are attainable. *** [T]he proper basis for assessing compensatory damages in such a case is to determine the item's 'actual value to [the] plaintiff'[;] *** the plaintiff is 'entitled to demonstrate its value to him by such proof as the circumstances admit.' " *Jankoski*, 157 Ill. App. 3d at 820, 510 N.E.2d at 1086, quoting *Long v. Arthur Rubloff & Co.*, 27 Ill. App. 3d 1013, 1026, 327

N.E.2d 346, 355 (1975). We specifically adopt the rationale of *Burgess v. Shampooch Pet Industries, Inc.*, 35 Kan. App. 2d 458, 463, 131 P.3d 1248, 1252 (2006), in which the Court of Appeals of Kansas held: "[W]hen an injured pet dog with no discernable market value is restored to its previous health, the measure of damages may include, but is not limited to, the reasonable and customary cost of necessary veterinary care and treatment."

In the present case, plaintiffs have demonstrated how much Molly is worth to them by paying $4,784 for the dog's veterinary care. Plaintiffs are not claiming a windfall; this is the amount they actually have paid or have contractually obligated themselves to pay. To prevent the award of damages from being nominal, we modify the trial court's judgment so as to award plaintiffs $4,784 in compensatory damages instead of $200.

## III. CONCLUSION

For the foregoing reasons, we modify the trial court's judgment so as to award plaintiffs $4,784 in damages. Otherwise, we affirm the judgment.

Affirmed as modified.

MYERSCOUGH and STEIGMANN, JJ., concur.