RICHARD JENSEN, Plaintiff-Appellee and Cross-Appellant, *v.* CHICAGO AND WESTERN INDIANA RAILROAD COMPANY, Defendant-Appellant and Cross-Appellee.

First District (3rd Division)    No. 79-781

Opinion filed March 31, 1981.

916

Bergstrom, Davis & Teeple, and Bradley, McMurray, Black & Snyder, both of Chicago, for appellant.

O'Malley & O'Malley, Ltd., of Chicago, for appellee.

Mr. JUSTICE McNAMARA delivered the opinion of the court:

Plaintiff, Richard Jensen, brought this action in the circuit court of Cook County against defendant, Chicago and Western Indiana Railroad Company, to recover compensatory and punitive damages for the alleged conversion of certain steam locomotive engines, railroad cars, parts, and tools stored on defendant's premises. The jury returned a verdict in favor of plaintiff and against defendant, and awarded plaintiff compensatory damages in the amount of $707,302 and punitive damages in the amount of $1,000,000. The trial court entered judgment on the jury verdict, and later denied defendant's post-trial motion for a new trial or judgment notwithstanding the verdict. Defendant appeals from the judgment and denial of its post-trial motion. Plaintiff cross-appeals from the trial court's denial of his motion seeking interest on the compensatory award from the date of conversion to the date of judgment.

Plaintiff is a transportation contractor engaged in the business of owning, operating, repairing, and restoring antique steam locomotives for display at museums and excursion trips. Defendant is a common carrier by rail. Between 1960 and 1969, plaintiff acquired two steam locomotives

(No. 5632 and No. 4963), eight additional railroad cars, and various railroad parts, tools and appurtenance items. In 1969, this railroad equipment was situated on defendant's property pursuant to lease agreement and subsequent amendments executed by the parties. On September 25, 1969, defendant sold plaintiff's equipment to a scrap dealer, Luria Steel & Trading Corporation (Erman-Howell), for $5,800. In 1973, plaintiff filed suit alleging, in part, that in violation of lease agreements and certain statutory provisions, defendant wilfully and wrongfully sold and converted plaintiff's property; that as a direct and proximate result, plaintiff was deprived of goods having substantial value; and that such wrongful conversion was committed by defendant "willfully, wantonly and in reckless disregard" for plaintiff's rights. Defendant filed an answer denying the material allegations in plaintiff's complaint. Thereafter, trial commenced and the following evidence was adduced.

In 1964, plaintiff visited Robert E. McMillen, defendant's vice-president and general manager at the time, to request storage space for the No. 5629 locomotive and tender, and suggested that they use an agreement he had entered into with another railroad as their format. This was agreed to and, on July 16, 1964, the parties executed a lease agreement whereby plaintiff leased storage space in defendant's 49th-51st Street roundhouse area. Pertinent paragraphs of the agreement provided:

> "6. Either party may terminate this lease at any time by giving not less than ten (10) days' notice in writing sent by registered mail to the other party, * * *.
> 7. Within thirty (30) days after the date of termination of this lease, Lessee shall remove all property belonging to it from the demised premises and restore the premises to their original condition to the satisfaction of Railroad, * * *. If Lessee shall fail to remove such property and restore the premises to their original condition within the specified period, Railroad, may, without notice to Lessee, perform such removal and restoration at the expense of Lessee, or take title to all property on the premises."

Subsequent amendments incorporated the provisions of the original agreement and increased storage space to accommodate additional items acquired by plaintiff.

On February 27, 1969, defendant, through its land and tax commissioner, Daniel J. Murray, wrote plaintiff a letter that defendant intended to close its 51st Street yard and demolish the buildings as soon as possible and requesting plaintiff to remove all his equipment immediately. Plaintiff began making plans to remove his equipment from defendant's property.

Thereafter, on March 10, 1969, the parties executed a final amendment authorizing plaintiff to bring a locomotive owned by a third party onto defendant's property for repair and overhaul within 30 days. Murray wrote plaintiff on May 7, 1969, acknowledging that plaintiff had been

granted an additional 30 days to overhaul the No. 207 locomotive. Murray noted that the overhaul had not begun and warned that plaintiff either take steps to vacate or defendant would be forced to consider sale of the equipment for scrap. Plaintiff next received a registered letter, dated May 15, 1969, which recited that it was a final notice of cancellation of plaintiff's lease, effective May 31, 1969. It stated that demolition of the roundhouse was imminent and that on June 1, 1969, any property remaining would belong to defendant.

At this point, some conflict in the testimony arises. Plaintiff related that a few days after receipt of the letter, he discussed the removal of his equipment with Robert E. Dowdy, then defendant's president. Plaintiff told Dowdy that if defendant wished to hold him to the 30-day removal provision, he would have to be furnished with boxcars in which to load his equipment. Plaintiff preferred to purchase his own cars for loading and removal. Dowdy replied that he would give plaintiff time to bring in his own railroad cars and to complete the removal. No specific date was set. Plaintiff informed Dowdy that several cars were ready for movement, but Dowdy wanted all the equipment to be shipped at one time. By the end of May, plaintiff had purchased three empty railroad cars on which to load his equipment. One car was misdirected and did not arrive at defendant's yard until August. Dowdy reassured plaintiff, however, that defendant would wait until his cars were loaded and could be shipped at one time. In the last week of August 1969, plaintiff finished loading his inventory onto the railroad cars.

Robert H. Snyder, defendant's superintendent of the operating department, observed plaintiff loading his equipment and advised plaintiff that he was overloading the cars. Snyder explained that without defendant's assistance and cooperation, plaintiff could not move any rolling stock off defendant's property.

Contrary to plaintiff's testimony, Dowdy, testifying as a hostile witness pursuant to Supreme Court Rule 238, stated that he did not allow plaintiff any extension of time after the May 15 letter nor did he direct anyone to grant such extension. He further testified that he had no knowledge that plaintiff was making efforts to move his equipment in May and June, 1969.

Plaintiff made plans to ship his stock to a railroad museum in Union, Illinois. He made alternate arrangements in August with James E. Rice, president of the Chicago, West Pullman and Southern Railroad. Rice testified that he agreed to store plaintiff's equipment on CWP&S property provided it was delivered to the railroad's interchange point at 104th Street. To reach CWP&S, plaintiff's cars would have to move over track belonging to the Belt Railway of Chicago. Rice explained that it was common to accommodate "special moves" of railroad equipment. He

indicated that special moves do not require all rolling stock to be in compliance with railroad interchange clearance requirements. Interchange involves the transfer of care and control of cars from one railroad to another.

Ronald F. Diehl, then defendant's freight or shipping agent, testified that, in early September, plaintiff stated that he wished to ship his 10 pieces of rolling stock, fully loaded, to the museum, or alternatively to CWP&S. Diehl conditionally accepted the equipment for shipment, subject to obtaining clearances for movement to the proposed destinations. Diehl prepared bills of lading and undertook the responsibility to obtain the inspection and clearances. Diehl informed plaintiff that he would be assessed a storage fee while awaiting the necessary clearances. Diehl contacted the connecting railroads involved in the planned move, Chicago and Northwestern Railroad and Belt, and requested mechanical inspections of plaintiff's equipment. Dowdy stated he had no knowledge that plaintiff's equipment was tendered to Diehl for shipment.

On September 19, 1969, representatives of the connecting railroads conducted a joint inspection of plaintiff's railroad cars at defendant's 51st Street yard. Plaintiff was present, and Diehl promised to notify him when the results of the inspection were received.

Donald F. Dilgard, assistant superintendent of the car department of C&NW, testified that he had to conduct an inspection to ensure that the equipment was mechanically sound and properly maintained. He explained that old locomotives do not have to meet Federal regulations and could be transported as a "special move." Such moves were uncommon. At the inspection, Dilgard gave conditional approval for movement of three cars, with special handling, at a slow speed, but refused to move the other cars. He observed that the No. 5629 tender had no coupler or air brakes. The baggage, gondola and flat cars were badly overloaded, in decayed condition, or improperly repaired. The two locomotives were partially disassembled and in various states of disrepair. When Dilgard informed plaintiff that he could not move the badly overloaded cars, plaintiff responded, "You have to move them, otherwise they are going to junk them * * *."

Plaintiff testified that he learned from Dilgard that some of the cars had been rejected, but that Dilgard informed him a final report would be forwarded. Dilgard submitted his report to Edward A. Burkhardt, general superintendent of transportation of CN&W. Neither Dilgard nor Burkhardt had any conversations with defendant's personnel concerning the report. Diehl never received a copy of any report, but was informed by plaintiff that several pieces of stock did not pass.

Immediately following the inspection, defendant coupled nine cars belonging to plaintiff, which were fully loaded, and with the use of its

own switching engine, pulled the stock from its 51st Street yard to operating tracks at its 83rd Street yard; the remaining car was moved the next day. The cars were transported as a special move at 5 m.p.h. At 83rd Street, the stock was placed in hold status inasmuch as it was received without any further instructions for its disposition. Dowdy testified that, to his knowledge, defendant had no storage space for plaintiff's stock at 83rd Street.

Meanwhile, on September 15, 1969, Dowdy instructed Joseph B. Gergets, defendant's purchasing agent, to dispose of plaintiff's property as soon as possible and to obtain the best price for the equipment. Gergets telephone six brokers and scrap dealers, and received three responses. He accepted bids only on an "all or nothing" basis. Erman-Howell, the closest scrap yard to defendant, was the ultimate purchaser, and Gergets notified it that plaintiff was the owner but that defendant had a legal right to dispose of the equipment. Gergets did not advise plaintiff that defendant was attempting to sell the equipment. Gergets did not contact railway museums or historical foundations because a sale to such institutions would require delivery and movement of the stock by interchange and plaintiff's equipment was not in good running condition. Since defendant had no scale on its property, Gergets made no attempt to weigh the equipment. Gergets also testified to several conversations with plaintiff between June and September 1969, in which he inquired about plaintiff's arrangements for removal. He informed plaintiff that the equipment would be disposed of if not removed. The gist of plaintiff's replies was that he did not believe Dowdy would sell the equipment.

Following an examination of the lease agreement and correspondence sent to plaintiff, John H. Park, then vice-president and general counsel for defendant, advised Dowdy that defendant had a right to sell the equipment. It was also disclosed that three cars involved in the sale to Erman-Howell were not mentioned in the original lease agreement or any subsequent amendment.

On September 25, 1969, plaintiff received a telegram from Dowdy, sent at 11:31 a.m. on September 24, 1969, which provided:

"Regarding our many conversations and communications demanding that you remove your equipment from Western Indiana premises. For your repeated failures to do so, effective at 12:01 p.m. September 25, 1969, CST, Western Indiana plans to sell as scrap to Erman-Howell Division of Luria Steel and Trading Corp. the two steam locomotives with tender, three tenders, one baggage car, one gondola car, two flat cars and one tool box car including all their contents which you brought upon the premises of Western Indiana. The proceeds of sale will be tendered to you. Therefore, if you do not yourself arrange for disposition of the foregoing

equipment, prior to 12 Noon on September 25, together with definite and approved routing instructions, and assured route clearances, the sale as scrap will be made as planned."

On September 25, 1969, defendant sold plaintiff's equipment to Erman-Howell.

Plaintiff believed that he had complied with the telegram's request inasmuch as the rolling stock had been moved to defendant's 83rd Street yard. After receiving the telegram, plaintiff inquired of Diehl about the inspection report; Diehl replied that he had received none. When plaintiff asked Dowdy why the equipment was sold during inspection procedures, Dowdy answered, "I just decided to do that."

Robert H. Rodeck, superintendent of Belt's car department, inspected plaintiff's equipment at defendant's 83rd Street yard for the move to Erman-Howell. Erman-Howell is located one block from Belt's 87th Street yard. Rodeck observed that the locomotives were in various stages of dismantling, and that other railroad cars were overloaded, in poor condition, and defective. He recommended that the equipment be moved at 1 m.p.h. On October 2, 1969, defendant moved the equipment to Belt's 87th Street yard; Belt then moved it to Erman-Howell.

Demolition work in the 51st Street area began in August 1969. Demolition of the roundhouse was completed on September 12, and the railroad tracks and ties were subsequently removed.

Plaintiff later attempted, unsuccessfully, to reacquire his property from Erman-Howell. Defendant tendered the proceeds of the sale, $5,800, to plaintiff; after a considerable period of time, plaintiff returned the check.

Testifying to the purchase and condition of his locomotives, plaintiff indicated that both the No. 5632 and No. 4963 were brought to defendant's property "dead in train." When plaintiff acquired the No. 5632 from the Chicago Burlington & Quincy Railroad Company in 1966 the locomotive was not operational and was in the process of overhaul. The restoration work was two-thirds to three-quarters completed. Most appurtenance items had been removed. Spare parts and appurtenance items purchased with the No. 5632 were bought by lot on a price per ton basis. Some of the parts were brand new items which CB&Q had obtained for the rebuilding process. The No. 4963 was purchased in 1967.

Glen H. Thompson, an employee of CB&Q, testified that he had been assigned to overhaul the 5632 locomotive which had been used for excursions and display. The restoring project had been abandoned after CB&Q performed seven or eight months of work, completed 75% of the task, and spent $100,000 on material alone. One or two months after the restoration work ended, plaintiff made the purchase.

Robert McMillen stated that when plaintiff purchased the No. 5632

locomotive the engine was completely disassembled and restoration work had been halted. Between summer 1966 and November 1966, the No. 5632 remained gutted of operational parts. Similarly, Joseph Hola, defendant's master mechanic, recalled that when the No. 5632 arrived on defendant's property, the boiler was stripped, the engine was gutted, and the appurtenance items were removed; this condition remained unchanged. The No. 4963 locomotive was more intact, but its engine was retired.

Plaintiff stated that his inventory of parts included spare rods for both locomotives. Rods are reciprocal components of a locomotive which operate to connect the wheels in motion. His inventory also contained appurtenance items such as headlight, bell, whistle, pipes, and gauges. He asserted that as a result of the sale of the rods and appurtenance items in his inventory, plaintiff was unable to make operational a locomotive (No. 965) remaining on the premises of a third party.

Plaintiff further testified that the loss of the locomotives and other equipment hampered his excursion business. Between 1966 and 1969, plaintiff conducted several excursions for fare paying passengers principally with the No. 5629 locomotive. (That locomotive had been removed from defendant's property before the sale and is not involved here.) Plaintiff had not conducted any excursions since the sale because mechanical departments of railroads were uncertain whether he could maintain his locomotives in compliance with Federal regulation in view of his loss of equipment. In 1974, plaintiff was offered $100,000 to supply and operate the No. 5632 locomotive for two years to pull the bicentennial "Freedom Train." Since this locomotive had been sold for scrap, plaintiff declined the offer. On cross-examination, plaintiff revealed that a cost of $20,000 would be incurred in preparing the locomotive for the requirements of such a trip; the cost of operation would range from $5,000 to $50,000.

Robert Dillon, a railroad machinist, testified to his familiarity with parts and equipment for steam locomotives. Having assisted plaintiff for several years with the overhaul of the No. 5632 locomotive, Dillon was familiar with the various tools and parts in plaintiff's inventory in September 1969. He testified that all of the tools and parts were valuable to the extent they could be used for steam engine repair.

Both sides produced expert witnesses who rendered opinions as to the value of plaintiff's locomotives and railroad parts and tools.

Herbert Hansen, an engineer and ex-president of the Illinois Railway Museum, testified for plaintiff that at the close of the 1960's the market value of steam locomotives was appreciating rapidly. Hansen estimated that in September 1969, plaintiff's No. 5632 locomotive had a market value of at least $50,000 and that the No. 4963 had a market value of at least $40,000.

John K. Byrne, a steam locomotive consultant called by plaintiff, testified that for one week he studied an inventory list prepared by plaintiff from his recollection. Byrne believed that those items for which a market existed had a total market value of $284,577. No market existed for the spare locomotive side and main rods, and replacement of these seven sets of rods by a forging process would cost $325,400.

J. David Conrad, a steam locomotive consultant, testified for defendant and estimated that in September 1969, the fair market value of No. 5632 was $20,000, and the fair market value of the No. 4963 was $25,000. After examining plaintiff's inventory list, Conrad concluded that the total market value of the parts and tools was $110,360. Conrad believed that there was no market for the side rods for No. 102 and that the value of these rods was scrap value of $20 per ton. The value of the rods for No. 965 was $15,000. This computation was based upon replacement by the flame or torch-cut process, a welding procedure.

On rebuttal, plaintiff asserted that replacement rods manufactured by the torch-cut process are not strong enough; he would use only forged rods. No evidence of market value of the eight railroad cars was introduced, and plaintiff asked scrap value of $25 per ton, a total of $7,325.

On appeal, defendant contends that several evidentiary rulings by the trial court, singly or cumulatively, constitute prejudicial error and warrant reversal.

Defendant first urges that the trial court erred in permitting plaintiff's counsel to examine Dowdy, formerly president of defendant, as a hostile witness pursuant to Supreme Court Rule 238 (Ill. Rev. Stat. 1977, ch. 110A, par. 238). Plaintiff initially asserted the right to call Dowdy, who had been employed by Belt since 1972, as an adverse witness under section 60 of the Civil Practice Act. Plaintiff claimed that by virtue of intermingled ownership Dowdy was actually working for defendant. Following a hearing on defendant's motion in limine to preclude such examination, the trial court concluded that Dowdy could not be examined pursuant to section 60. At trial, plaintiff called Dowdy as his first witness. Dowdy explained that five railroads own defendant and that the same railroads have a 5/13 interest and lease rights for the Belt. Belt and defendant have two common directors. Dowdy testified to his current and past employment positions at both railroads, and to his business and personal relationship with defendant's current president, Park. The trial court then granted plaintiff the right to cross-examine Dowdy under Rule 238. The trial court stated that it would anticipate that, as long as the witness testifies truthfully, such manner of examination would not be prejudicial.

Supreme Court Rule 238 provides, in relevant part:

> "If the court determines that a witness is hostile or unwilling, he may be examined by the party calling him as if under cross-examination."

The propriety of using the procedure authorized by this rule rests largely within the discretion of the trial court. *People v. Swimley* (1978), 57 Ill. App. 3d 116, 372 N.E.2d 887.

■■ Rule 238 applies only to witnesses who, while on the witness stand, prove to be hostile, uncooperative, or unwilling. (*Quagliano v. Johnson* (1968), 100 Ill. App. 2d 444, 241 N.E.2d 187.) Here, there was no judicial determination that Dowdy was hostile or unwilling to testify. The record does not reflect that Dowdy had proved himself, by demeanor or testimony, to be reticent, deceptive, evasive or uncooperative. Plaintiff suggests that Dowdy was properly questioned as a hostile witness in view of his employment, his ongoing relationship to defendant, and particularly the fact that his own conduct and actions gave rise to the present suit. Yet, it is clear that the mere fact Dowdy may have given testimony unfavorable to plaintiff or may be unsympathetic to plaintiff's case is not, in itself, sufficient to invoke the provisions of the rule. (*Yamada v. Hilton Hotel Corp.* (1977), 60 Ill. App. 3d 101, 376 N.E.2d 227.) Consequently, it was error to permit plaintiff to examine Dowdy pursuant to Rule 238.

We do not believe, however, that this error was prejudicial. Defendant charges essentially that it was prejudiced because plaintiff's counsel converted leading questions into unsupported testimony outside Dowdy's knowledge. The objectionable questions addressed Dowdy's knowledge of such events as plaintiff's efforts to remove his equipment, request for inspection, arrangement for alternative storage space, and tender of cars to Diehl for shipment. These matters were subsequently proved independently by testimony elicited from such witnesses as Diehl and Rice.

Defendant also asserts that plaintiff's counsel was erroneously permitted to impeach Dowdy under Rule 238 by use of a prior inconsistent statement where no grounds for impeachment existed. In support, defendant points out that a witness declared hostile under the rule may be asked leading questions solely for the purpose of refreshing his recollection and not for impeachment. See *Martin v. Brennan* (1977), 54 Ill. App. 3d 421, 369 N.E.2d 601; *Kubisz v. Johnson* (1975), 29 Ill. App. 3d 381, 329 N.E.2d 815.

■■ There are, however, two parts to Rule 238. The second portion reads:

> "The party calling an occurrence witness, upon the showing that he called the witness in good faith and is surprised by his testimony, may impeach the witness by proof of prior inconsistent statements."

This provision operates as one exception to the general rule that a party

may not impeach his own witness. (*Seibutis v. Smith* (1980), 83 Ill. App. 3d 1010, 404 N.E.2d 950.) Under this part of the rule, there is no requirement that there be a determination of the witness' hostility. *O'Boyle v. Greco Excavating Co.* (1972), 9 Ill. App. 3d 234, 292 N.E.2d 90.

■■ In a deposition taken before trial, Dowdy stated that he had no recollection of the inspection conducted on September 19, 1969. At trial, he testified that he had knowledge of such inspection. This testimony was unexpected and at variance with an earlier statement, and plaintiff properly proceeded to impeach Dowdy by directing his attention to the prior inconsistent statement.

Defendant also urges that the trial court erred in excluding certain relevant and material testimony of Joseph Hola, defendant's master mechanic, purportedly demonstrating plaintiff's failure to prepare his cars for shipment.

At trial, Hola testified that the air brakes of railroad cars moving in interchange or over main lines must be cleaned and inspected periodically. Upon passing such inspection, a date is stenciled on the air tank of the car. Such date is referred to as an "in date." Hola recounted when he observed two of plaintiff's cars in the roundhouse area in August 1969, the cars were "out of date." During September, he noticed that the same cars were stenciled "in date" but that the necessary work had not been performed. At this point, without objection by plaintiff's counsel, the court called for a conference outside the jury's presence. The court thereupon prohibited further testimony on this issue on the grounds of materiality, noting that Hola's observations were unrelated to the actions taken by the inspecting railroads. In an offer of proof, Hola repeated his earlier testimony.

■■ The court's refusal to admit this testimony was not improper since there was no suggestion that Hola's observations affected or influenced, in any way, the outcome of the inspection. Moreover, the testimony elicited in the offer of proof was merely duplicative of the testimony he had given.

Defendant also urges that the court erred in prohibiting any reference to a derailment of plaintiff's locomotive.

On direct examination, Rodeck testified that some days after the movement of plaintiff's equipment from defendant's 83rd Street yard, he observed the larger locomotive (No. 5632) derailed on a track going into Erman-Howell. On cross-examination, Rodeck disclosed that the derailment occurred in an area where the track was curved; he had no knowledge of the degree of curvature. Outside the jury's presence, the court stated that even though no objection to the derailment testimony had been made, such evidence should have been excluded; the evidence lacked foundation and probative value inasmuch as a multitude of factors

could have caused the derailment. Having so concluded, the court admonished both sides to refrain from making any reference to the derailment in closing arguments.

Defendant maintains that barring further comment on this matter was prejudicial error since the derailment was evidence of plaintiff's failure to ready his equipment mechanically for a legal interchange and hence evidence of a breach of contract. Defendant points to no contractual provision requiring plaintiff to ready his cars mechanically for interchange. Nor did Rodeck's testimony causally link the mechanical condition of the locomotive to the derailment. The court properly considered the evidence to lack foundation and have no probative value. In any event, the jury heard Rodeck's testimony and was not instructed to disregard it. Prohibiting further reference to the derailment was not prejudicial to defendant.

Defendant further contends that the trial court erred in excluding certain witnesses whose names had not been disclosed to plaintiff prior to trial.

Trial commenced on December 4, 1978. On December 18, 1978, after plaintiff had rested and defendant had presented one day of testimony, defendant announced its intention to call six witnesses from the Belt Railway whose names had not been listed in an answer to an interrogatory. In response to plaintiff's motion to exclude the witnesses, defense counsel represented that he only learned of these witnesses after trial commenced and that he had little opportunity to conduct discovery after receiving the case. Defense counsel acknowledged that he never sought a protective order, further discovery, or a postponement of trial. The court, finding this was an improper time to develop new witnesses, ruled that the witnesses would be precluded from testifying.

■■ A court in its discretion may exclude a witness for a party's failure to comply with discovery rules. (*Clay v. McCarthy* (1979), 73 Ill. App. 3d 462, 392 N.E.2d 693; see *Dempski v. Dempski* (1963), 27 Ill. 2d 69, 187 N.E.2d 734; *Wright v. Royse* (1963), 43 Ill. App. 2d 267, 193 N.E.2d 340; *Battershell v. Bowman Dairy Co.* (1961), 37 Ill App. 2d 193, 185 N.E.2d 340.) Factors to be considered in determining whether an appropriate sanction has been invoked include: surprise to the opposing party; whether the omission was intentional or inadvertent; the nature of the witness' testimony; timeliness of the objection; opportunity of the opposing party to interview or depose the witness prior to trial; and prejudice resulting to the opposing party by virtue of the testimony. *Western Electric Co. v. Bauer Brothers Construction Co.* (1971), 131 Ill. App. 2d 1028, 268 N.E.2d 445; see *Wright v. Royse.*

■■ Defendant argues that the exclusion of the witnesses precluded it from introducing a "major portion of its evidence" concerning the

September 19, 1969, inspection; that such evidence could have rebutted plaintiff's claim that the cars were suitable for movement over the Belt's tracks; and that there would be little chance of surprise or prejudice to plaintiff since he attended the inspection. No offer of proof having been made, the record is silent concerning the nature or substance of the testimony or the element of surprise to plaintiff. Where defendant offered the testimony of six unnamed witnesses after plaintiff's case in chief was concluded, we cannot say that the trial court's refusal to allow them to testify constituted an abuse of discretion. *Dempski v. Dempski*; but see *Clay v. McCarthy.*

Defendant further contends that the trial court committed reversible error in refusing to submit or in submitting certain instructions to the jury.

■■ The criterion for determining the propriety of instructions is whether the jury was fairly, fully and comprehensively informed on the relevant principles, considering the instructions in their entirety. (*Saunders v. Schultz* (1960), 20 Ill. 2d 301, 170 N.E.2d 163.) Instructions must be given only when there is evidence which supports the theory of the instructions; if there are no facts in the record which support a theory an instruction on that theory is prejudicial error. *Graves v. Wornson* (1978), 56 Ill. App. 3d 873, 371 N.E.2d 692.

The court refused to give an instruction tendered by defendant which stated:

> "In fixing the amount of money which will reasonably and fairly compensate the plaintiff, you are to consider that a person whose property is damaged must exercise ordinary care to minimize existing damages and to prevent further damage. If any loss results from a failure to exercise such care, damages cannot be recovered for such loss."

Defendant claims that the evidence demonstrates plaintiff made no effort to minimize his damage, to prevent further damage or to avoid the loss altogether, and thus the instruction should have been given. Defendant points to plaintiff's failure to respond to comments by Snyder and Dilgard that the cars were overloaded; failure to alert defendant, upon receipt of the telegram, that the equipment had far greater than scrap value; and failure to communicate with Dowdy until five days after receipt of the telegram. Plaintiff counters that the proposed instruction is inapplicable here and that there was no evidence to support such instruction. We agree.

■■ ■ Clearly, a party being damaged cannot stand by and allow the injury to continue and increase without making reasonable efforts to avoid further loss. (*Fruehauf Trailer Co. v. Lydick* (1944), 325 Ill. App. 28, 59 N.E.2d 551.) Here, however, plaintiff's failure to act upon the overloading caution occurred prior rather than subsequent to the alleged

conversion. Damage to plaintiff arising from the conversion was complete and fixed as of the date of the conversion. (See generally *S. T. Enterprises, Inc. v. Brunswick Corp.* (1974), 57 Ill. 2d 461, 315 N.E.2d 1; *Long v. Arthur Rubloff & Co.* (1975), 27 Ill. App. 3d 1013, 327 N.E.2d 346.) Accordingly, the failure to correct the overloaded condition could not have minimized the existing damage occasioned by the allegedly wrongful sale nor could it have prevented further damage. The omission complained of actually goes to plaintiff's effort to avoid the conversion itself, rather than an attempt to mitigate any existing damages. The case of *East Hampton Dewitt Corp. v. State Farm Mutual Automobile Insurance Co.* (2d Cir. 1973), 490 F.2d 1234, cited by defendant, is inapposite. There, an instruction allowed the jury to consider whether the absence of faulty construction by the lessor would have minimized damages caused by a fire started through a lessee's subsequent negligence. The court found no reason why the same policy considerations against awarding damages which could reasonably have been avoided "should not apply, at least as a general matter, where the plaintiff's failure to take reasonable precautions against the aggravation of negligent damage fairly to be anticipated occurs before the defendant's negligent act." (490 F.2d 1234, 1239.) In the present case, however, there is no evidence of any lack of reasonable conduct on the part of plaintiff which might have protected against the "aggravation" damages sustained as a result of defendant's subsequent sale.

Moreover, notifying defendant of the equipment's greater value after receipt of the telegram would have been futile once defendant had agreed to the terms of the sale and had claimed title and possession to the equipment. Additionally, the evidence disclosed that plaintiff attempted, without success, to reacquire his property from Erman-Howell. In *Williams v. Board of Education of Clinton Community* (1977), 52 Ill. App. 3d 328, 367 N.E.2d 549, this court, after recognizing a plaintiff's duty to mitigate damages, was not convinced that mitigation was possible since the evidence did not establish the availability or cost of replacement materials for the notes converted. As in *Williams*, defendant has presented no evidence to demonstrate the availability of replacement locomotives. We also find untenable defendant's claim that plaintiff's retention of the $5,800 check for months or years and his failure to commence legal action earlier constitute a want of mitigation. The court properly refused the instruction.

Defendant also challenges the propriety of the following instruction, given over its objection:

"When performance under a contract by one party has been prevented by the other party, no advantage can be taken of the

failure to perform. Performance by one party is excused where it is prevented by the opposite party."

Plaintiff states that this instruction was requested in light of defendant's affirmative defense that plaintiff breached his contract by failing to prepare his equipment properly for shipment. Defendant maintains that since there was no evidence of conduct or omissions on defendant's part which could be characterized as acts tending to prevent plaintiff from moving equipment, it was error to give the instruction.

We believe there was sufficient evidence to support the giving of the instruction. Testimony indicating that plaintiff acquired additional cars, loaded his equipment, and tendered his stock may be perceived as evidence of an attempt to comply with the removal provision of the lease agreement. Snyder acknowledged that plaintiff could not remove his equipment without receiving defendant's help and cooperation. Plaintiff testified that after receiving the May 15 letter, he advised Dowdy that some cars were ready for movement. According to plaintiff, Dowdy wanted all cars shipped at one time, and agreed to await plaintiff's acquisition of additional cars for loading. Diehl testified that upon plaintiff's tender of stock, he conditionally accepted the cars, and undertook to arrange the inspection and secure the requisite clearances. Without having received a final inspection report, defendant gave plaintiff 24 hours' notice to arrange for disposition of his stock before selling it. These actions could be viewed as preventing plaintiff's removal of his stock. The instruction fairly and accurately apprised the jury on the doctrine of prevention and was properly given. See *John Kubinski & Sons, Inc. v. Dockside Development Corp.* (1975), 33 Ill. App. 3d 1015, 339 N.E.2d 529.

Defendant further argues that the court erred in the giving of certain instructions tendered by plaintiff on the issue of bailment. At the conclusion of trial, the court instructed the jury, without objection by defendant, that one theory upon which plaintiff based his theory of conversion was that the sale violated defendant's duty as a bailee. The court gave the following instructions, one of which was tendered by defendant:

"A bailment is created by agreement, whether express or implied, and requires both delivery by bailor and acceptance by bailee so that bailee may exercise exclusive control of bailed property." (Defendant's Instruction No. 3.)

"A party who comes into the possession of property belonging to another is a bailee of that property." (Plaintiff's Instruction No. 6.)

"If you find that at the time of the occurrence in question that [*sic*]

the defendant was a bailee then you are instructed that the duty of the defendant was not to act in derogation of the rights of the owner of the property." Plaintiff's Instruction No. 7.

Defendant contends that inasmuch as Diehl's acceptance was conditional upon securing necessary clearances, the court should not have permitted the question of acceptance by defendant to go to the jury. It further maintains that the instruction defining a bailee was erroneous and inconsistent with the instruction given, at defendant's request, concerning the creation of a bailment. It argues that the error was compounded by prejudicial statements made by plaintiff's counsel during closing argument creating the impression the bailee's liability is absolute once such status is established.

■■ We initially note that defendant offered no objection to the giving of plaintiff's Instruction No. 7. A reviewing court will not consider an alleged error in the giving of instructions unless specific objections have been made before the trial court. (*Korleski v. Needham* (1966), 77 Ill. App. 2d 328, 222 N.E.2d 334.) Moreover, the giving of an instruction concerning acceptance and bailment was not improper in view of the evidence of plaintiff's tender of his stock and Diehl's acceptance for shipment pending clearances. Further, we perceive no inconsistency between the instruction defining a bailee and the one setting forth the manner in which a bailment relationship may be created. Nor do we find any remarks by plaintiff's counsel suggesting that a bailee's liability is absolute. During closing argument, counsel commented that when possession is accepted by a railroad, it has a duty as a bailee; that a bailment existed by virtue of plaintiff's tender; and that defendant's duty was not to act in derogation of plaintiff's rights to his property. These remarks were not improper.

Arguing that plaintiff failed to present a prima facie case on liability, defendant urges that the trial court erred in declining to grant its motion for judgment.

■■ To constitute conversion of a chattel, there must be an unauthorized assumption of the right to possession or ownership. (*Dickson v. Riebling* (1975), 30 Ill. App. 3d 965, 333 N.E.2d 646; *Hobson's Truck Sales, Inc. v. Carroll Trucking, Inc.* (1971), 2 Ill. App. 3d 978, 276 N.E.2d 89.) The essence of conversion is not acquisition by the wrongdoer but a wrongful deprivation of the owner thereof. (*First Finance Co. v. Ross* (1966), 75 Ill. App. 2d 403, 221 N.E.2d 37.) One claiming conversion must show a tortious conversion of the chattel, a right to property in it, and a right to immediate possession which is absolute and unconditional and not dependent upon the performance of some act. (*Hobson's Truck Sales, Inc. v. Carroll Trucking, Inc.*) All that is required is that defendant exercise control over the chattel in a manner inconsistent with plaintiff's right of possession. *Dickson v. Riebling.*

Defendant argues that the evidence discloses that in assuming title to sell the property, defendant was not guilty of conversion but was instead acting within its legal rights under the lease agreement. As support defendant points to correspondence and conversations demanding removal; plaintiff's failure to effect timely removal or to prepare and load his cars properly for shipment; and plaintiff's failure to demand return of the property or protest the sale.

■■ Other evidence, however, tends to refute defendant's position that the sale was authorized and to suggest that defendant may have acted in a manner inconsistent with plaintiff's right to possession when it sold the property for scrap. Dowdy's unspecified time extension for removal of plaintiff's equipment beyond that set forth in the parties' lease agreement and his refusal to allow transport of the equipment on a piecemeal basis, combined with Diehl's conditional acceptance of the stock for shipment, and undertaking to obtain the necessary inspection and clearances, support the inference that defendant agreed to wait for plaintiff to effectuate the removal of his equipment. By selling plaintiff's property, contrary to its agents' representations and without having received a final inspection report, defendant could be deemed to have deprived plaintiff of his property. Moreover, demand by plaintiff and refusal to deliver are unnecessary to establish conversion where some other independent act of conversion can be shown. (*Hobson's Truck Sales, Inc. v. Carroll Trucking, Inc.*) The acknowledged sale of the equipment for cash would appear to constitute such independent act. Consequently, we conclude that sufficient evidence was produced to justify submission of the issue of conversion to the jury. Under the conflicting evidence presented, it was a question of fact for the jury to determine whether defendant converted plaintiff's property. (*Boudoures v. Galloway* (1930), 258 Ill. App. 30.) Accordingly, we find nothing to warrant reversal of the judgment in favor of plaintiff as to liability.

Defendant next challenges several evidentiary rulings of the trial court concerning proof of compensatory damages.

■■ We note prefatorily that plaintiff has the burden of proving damages to a reasonable degree of certainty. (*Williams v. Board of Education* (1977), 52 Ill. App. 3d 328, 367 N.E.2d 549.) Generally the measure of damages for conversion of personal property is the market value of the property at the time and place of conversion plus legal interest. *Henkel v. Pontiac Farmers Grain Co.* (1977), 55 Ill. App. 3d 898, 371 N.E.2d 352; *Lee Shell Co. v. Model Food Center, Inc.* (1969), 111 Ill. App. 2d 235, 250 N.E.2d 666.

The proof of damages adduced at trial can be summarized as follows: Hansen, testifying for plaintiff, opined that the fair market value of the No. 5632 and No. 4963 locomotives in September 1969 was at least

$50,000 and $40,000, respectively. In contrast, Conrad testified for defendant that the fair market value for these locomotives was $20,000 and $25,000, respectively. Byrne, testifying for plaintiff, concluded that the value of those items in the inventory for which a market existed totaled $284,577, whereas Conrad estimated the value to be $110,360. In addition, Byrne testified that the replacement cost of rods having no market was $325,400; Conrad estimated the replacement cost to be $15,000.

We first consider defendant's contention that the trial court erroneously instructed the jury to award the replacement cost of items having no market without regard to their actual value. The instruction is as follows:

> "If you decide for the Plaintiff on the question of liability, you must then fix the amount of money which will reasonably and fairly compensate him for any of the following elements of damage proved by the evidence to have resulted in the wrongful conduct of the Defendant:
>
>> Fair cash market value for such property for which a market existed in September, 1969.
>>
>> Replacement cost of the property for which no market existed in September, 1969.
>
> Whether any of these elements of damages has been proved by the evidence is for you to determine."

Defendant complains that the instruction improperly suggested that replacement cost is a mandatory, rather than permissible, standard of damages for an item having no market value, and permitted the jury to grant expensive replacement costs for certain locomotive rods without showing that they had actual value or utility to plaintiff.

We initially reject plaintiff's contention that defendant waived error on the grounds now asserted by failing to interpose this specific objection before the trial court. At trial, defendant objected to the inclusion of replacement cost as a false and erroneous standard upon which to consider plaintiff's loss, and urged that fair market value was the appropriate element of damage. This objection was sufficient to preserve the issue for review.

■■ ■ Property which is not an ordinary object of commerce or is unique may not be susceptible to the general measure of damages. (See *Long v. Arthur Rubloff & Co.* (1975), 27 Ill. App. 3d 1013, 327 N.E.2d 346.) The fact that personal property has no market value, however, does not restrict recovery to nominal damages only; its value or the plaintiff's claims must be ascertained in some other rational way and from such elements as are attainable. (*Long v. Arthur Rubloff & Co.; Lee Shell Co. v. Model Food Center, Inc.*) In ascertaining the value of a lost item having no market value, inquiry may be made into the cost of producing or replacing the article. (See *Lee Shell Co. v. Model Food Center, Inc.*)

Where, however, the nature of the article is not such as to make production or replacement cost a viable alternative, the proper basis for determining compensatory damages is its actual value to plaintiff. See *Long v. Arthur Rubloff & Co.*

Testimony as to whether a market existed for certain spare rods was contradictory. The experts agreed only that no market existed for the rods to the Nos. 965 and 102 locomotives. Whether a market existed thus was properly a question for the jury to consider. The alleged error in the instruction arises once the jury has made a determination that no market exists for a particular article.

■■ The instruction directs the jury to assess replacement cost, if proved, as damages for items having no market. Such instruction does not allow any consideration as to whether replacement is a viable alternative and hence whether the proper element of damages should be actual value to plaintiff. Here, plaintiff's theory of recovery was that these lost rods had economic value to plaintiff in the operation, repair, and restoration of his and other person's locomotives. Yet no testimony was introduced to establish the reasonable value of these items in plaintiff's work. In fact, evidence adduced as to the status or condition of the reciprocal locomotives tended to negate the utility of some rods and the feasibility of their replacement. For example, Byrne's testimony revealed that replacement rods for the No. 102 locomotive would cost $28,000. The No. 102 however, is presently gutted of operational parts and is located at an abandoned coal mine which is missing five miles of connecting track between the mine and the railroad's main track. Additionally, plaintiff testified that he never intended to move the locomotive out. Another set of rods costing $90,000 to replace were valuable only in the event the No. 5629 broke a rod. There was testimony, however, that such rods were virtually indestructible. Costly replacement or production expenses for rods which might have little or no usefulness to plaintiff may not have been a viable alternative. (See generally *Potts v. Lux* (1950), 168 Kan. 387, 214 P.2d 277.) By setting forth replacement cost as the element of damages for property having no market value, the instruction did not allow the jury, in measuring damages for some of these items, to consider their actual value to plaintiff. Accordingly, we find this instruction erroneous, misleading and prejudicial to defendant. We therefore set aside the compensatory award of damages fixed by the jury. Since the matter must be remanded for a new trial on the issue of compensatory damages, we shall mention briefly other errors raised by defendant referring to assessment of damages.

■■ Defendant complains that the trial court admitted certain photographs, motion pictures, brochures, and testimony about excursions. This included a 10-minute film of excursions using four different steam loco-

motives. We believe that the court could have concluded that this evidence would aid the jury in understanding the testimony concerning excursions, restoration and operation of locomotives and their components, and that it was relevant to plaintiff's claim for damages. Moreover, defendant was not prejudiced by their introduction since it was allowed to cross-examine plaintiff about the exhibits and his excursion business.

The trial court excluded comparable sales and transactions of locomotives upon which the expert witness, Conrad, based his opinion of value. The record reveals that Conrad's transactions were not similar to those of plaintiff; the court's rulings were proper.

Defendant also contests the trial court's exclusion of the actual purchase prices paid by plaintiff for the locomotives. It asserts that the actual prices, while not determinative in themselves, were probative, competent evidence of value.

An offer of proof outside the presence of the jury disclosed that plaintiff purchased the No. 5632 locomotive and tender in 1966 for $11,000 and purchased the No. 4963 and tender in 1967 for $7,000. Noting the great disparity between the valuation testimony and the actual purchase prices, the trial court excluded this evidence. Later, by agreement of the parties, defendant was permitted to elicit from plaintiff the actual purchase prices of some of the railroad cars and equipment; these purchase prices totaled $6,635.

■■ In determining the value of property that cannot be restored, the finder of fact may consider the purchase price as a basis for valuation, as well as any other evidence that is material to the issue of value. (*Martin v. McIntosh* (1976), 37 Ill. App. 3d 526, 346 N.E.2d 450; *Mineika v. Union National Bank* (1975), 30 Ill. App. 3d 277, 332 N.E.2d 504.) The length of time which has elapsed between the original sale and the time damage is sustained is a factor to be considered in determining whether to admit the purchase price. (See *Daniel v. Elgin, Joliet & Eastern Ry. Co.* (1965), 58 Ill. App. 2d 414, 208 N.E.2d 311.) Whether to admit prior sale prices into evidence is a matter within the trial court's discretion. *Department of Transportation v. Prombo* (1978), 63 Ill. App. 3d 407, 379 N.E.2d 953.

■■ The trial court concluded that the 1966 and 1967 purchase prices paid by plaintiff were not probative to show fair market value of the locomotive in September 1969. Such finding is buttressed by Hansen's testimony that the market value of locomotives was appreciating rapidly at the end of the 60's. We cannot say that the trial court abused its discretion in excluding the actual purchase prices of the two locomotives and tenders.

■■■ Defendant finally contends that the trial court erred in submitting the issue of punitive damages to the jury.

Whether the facts of a particular case justify the imposition of punitive damages is a question of law. (*Kelsay v. Motorola, Inc.* (1978), 74

Ill. 2d 172, 384 N.E.2d 353; *Knierim v. Izzo* (1961), 22 Ill. 2d 73, 174 N.E.2d 157; *Stribling v. Chicago Housing Authority* (1975), 34 Ill. App. 3d 551, 340 N.E.2d 47.) Submission of the issue of punitive damages to the jury is a matter within the trial court's discretion and its determination will not be disturbed absent an abuse of that discretion. (*Queen v. Behm* (1978), 58 Ill. App. 3d 253, 373 N.E.2d 1382.) Generally an award of punitive damages is accompanied by aggravating circumstances such as wantonness, wilfulness, malice, fraud, oppression, violence or reckless-ness. (*Zokoych v. Spalding* (1976), 36 Ill. App. 3d 654, 344 N.E.2d 805; *Wetmore v. Ladies of Loretto* (1966), 73 Ill. App. 2d 454, 220 N.E.2d 491.) Where assessed, the purpose of punitive damages is to punish the defendant and to deter others from committing similar acts. (See *Mat-tyasovszky v. West Towns Bus Co.* (1975), 61 Ill. 2d 31, 330 N.E.2d 509; *George v. Chicago Transit Authority* (1978), 58 Ill. App. 3d 692, 374 N.E.2d 679.) Because of their penal nature, punitive damages are not favored in the law, and courts must exercise caution to see that punitive damages are not improperly or unwisely awarded. *Kelsay v. Motorola, Inc.*; see *Smith v. Dunaway* (1966), 77 Ill. App. 2d 1, 221 N.E.2d 665.

Application of these principles compels us to conclude that the assessment of punitive damages was unwarranted under the facts pre-sented. Evidence revealed that defendant acted under a bona fide claim of title to the property, albeit mistaken. Defendant's agents testified that they sold the equipment under the belief and advice of counsel that, pursuant to the parties' lease agreement, plaintiff's failure to remove his equipment within the specified time authorized the taking of title and disposition of the property. Such conduct does not reflect an intentional or wanton disregard of plaintiff's rights. (See *Wetmore v. Ladies of Loretto; Queen v. Behm.*) Moreover, defendant apprised plaintiff of its demolition plans and explicitly advised him to remove his equipment or the sale for scrap would proceed. (Compare *Dickson v. Riebling.*) Plain-tiff points to the callousness of affording only 24 hours to remove his equipment. The notice, however, demanded the submission of approved arrangements for shipment, not removal itself. Plaintiff further points to the lack of communication between defendant's agents prior to the sale regarding the status of plaintiff's equipment, and the failure to comply with obligations created by Diehl's actions and representations. Although such lack of communication or the inconsistent representations could be deemed carelessness, we do not believe it amounted to wilful or wanton conduct. Moreover, defendant's failure to transport the equipment to the known alternative destination, CWP&S, cannot be characterized as "recklessly ignoring options," where such equipment required passage over the Belt's tracks, and that railroad, to Hola's knowledge, had rejected the cars for movement.

■■ The trial court reasoned that the disparity between the apparent worth of the equipment and scrap price at which it was ultimately sold permitted an inference of malice and lack of care in exploring the true value of the railroad stock. Refuting this position is the fact that upon receipt of the telegram, plaintiff did not protest the sale or alert defendant that the equipment had substantially greater than scrap value. Moreover, defendant presented testimony explaining that it contacted only scrap dealers because the equipment could not move on interchange for delivery to museums; that it solicited bids from six dealers seeking to obtain the highest price possible; that it was unable to weigh the equipment because it had no scale and could not transport the stock through interchange to be weighed by another railroad; and that defendant had to dispose of the property quickly because its roundhouse area was being demolished. We find nothing in the record to suggest that defendant opted for scrap value knowing that the equipment had greater value or that defendant wantonly, wilfully, or recklessly disposed of the property without any inquiry as to its value. Recognizing that punitive damages are to be allowed with caution, we do not believe that the wrongful conversion was accompanied by aggravating circumstances warranting the assessment of punitive damages. We thus conclude that the trial court abused its discretion in submitting the issue of punitive damages to the jury.

Remaining for our consideration is plaintiff's contention on cross-appeal that the trial court erred in denying his motion to add interest to the compensatory award from the date of conversion to the date of judgment. Since we are remanding the cause for a new trial on the issue of compensatory damages, we must address that issue.

In Illinois, the allowance of prejudgment interest is governed by statute. (*North Shore Marine, Inc. v. Engel* (1980), 81 Ill. App. 3d 530, 401 N.E.2d 269; Ill. Rev. Stat. 1979, ch. 74, par. 2.) Section 2 of the Interest Act provides, in relevant part, that interest shall be allowed on "money withheld by an unreasonable and vexatious delay of payment." Decisions of our supreme court have recognized that interest may be recovered where property had been wrongfully taken or converted into money; such recovery is based upon the statute's authorization of interest when there has been an unreasonable and vexatious delay of payment. (See *Geohegan v. Union Elevated R.R. Co.* (1915), 266 Ill. 482, 107 N.E. 786; *Schwitters v. Springer* (1908), 236 Ill. 271, 86 N.E. 102; *Illinois Central R.R. Co. v. Cobb, Blaisdell & Co.* (1874), 72 Ill. 148.) In *Illinois Central R.R. Co. v. Cobb, Blaisdell & Co.*, the court reasoned, at page 153, that there was no difference between "the delay of payment of a moneyed demand and one where property has been wrongfully taken, or taken and converted into money or its equivalent * * *." Moreover, in *City of Chicago v. Allcock* (1877), 86 Ill. 384, 386, the court explained that where

one party unlawfully takes another's property and converts it into money, it is reasonable that, as he has use of the money, he be required to pay interest on it, and continued, "[i]n such case the money may be regarded as 'withheld by an unreasonable and vexatious delay of payment'."

This court has considered the propriety of an award of prejudgment interest pursuant to section 2 of the Interest Act where property has been wrongfully converted. In *Brown v. Peter Epsteen Pontiac, Inc.* (1977), 55 Ill. App. 3d 876, 371 N.E.2d 151, plaintiff sought to increase the judgment by adding interest from the date of the illegal conversion of his automobile. There, after plaintiff left his damaged and undrivable automobile on a dealer's lot for two years without ordering any repairs, the car dealer sold plaintiff's automobile to a junk dealer. Noting that plaintiff's actions raised a reasonable doubt as to whether he had abandoned the car, the court reasoned that there was a material dispute as to ownership of the automobile and that the dealer did not unreasonably or vexatiously withhold payment, and refused interest to plaintiff.

Prejudgment interest was also disallowed in *Kelrick v. Koplin* (1966), 73 Ill. App. 2d 63, 219 N.E.2d 758. The trial court ordered summary judgment in favor of plaintiff in a conversion action against defendant bailees to recover the value of jewelry. Defendants had maintained that the jewelry was accepted as partial payment for an underlying debt. The trial court awarded interest to plaintiff. Reasoning that there appeared to have been an honest dispute concerning the underlying debt and that the delay in payment was not unreasonable or vexatious, this court held that the trial court improperly allowed interest. But see *Henkel v. Pontiac Farmers Grain Co.* (1977), 55 Ill. App. 3d 898, 371 N.E.2d 352.

■■ We believe that the *Brown* and *Kelrick* decisions are controlling, and that the trial court correctly declined to grant plaintiff's motion seeking prejudgment interest. We believe the facts before us present a material and honest dispute concerning title and right to sell the equipment. Defendant's reasonable defense of the suit cannot be characterized as an unreasonable and vexatious delay of payment. We direct that no prejudgment interest be awarded after the retrial.

For the foregoing reasons, the judgment in favor of plaintiff and against defendant is affirmed insofar as it determines liability. That portion of the judgment awarding compensatory and punitive damages is reversed and vacated, and the cause is remanded for a new trial to determine compensatory damages only. The order denying plaintiff's motion for prejudgment interest is affirmed.

Affirmed in part; reversed in part; and reversed and remanded in part.

RIZZI, P. J., and McGILLICUDDY, J., concur.